PATRICK E. HIGGINBOTHAM, Circuit Judge:
Today we consider a challenge to the Beaumont Independent School District’s “Clergy in the Schools” program, which enlists various clerical volunteers to counsel groups of students regarding secular topics. We granted en banc review after a panel of this court, reversing the district court, held that the student plaintiffs had standing and that the program violated the Establishment Clause of the First Amendment. We agree that the plaintiffs have demonstrated standing sufficient to withstand summary judgment. However, perhaps because the parties did not squarely engage each other on the merits, they have produced an uncertain record burdened with genuine issues of material fact, including the place of the clergy program in the District’s larger overall volunteer program.[1] We therefore REVERSE, and REMAND to the district court.
The ultimate question in this Establishment Clause case is equality of treatment: whether the school board preferred religion over non-religion. It follows, at trial, that the district court must not confine its analysis to only “Clergy in the Schools.” Rather, the court can and should examine the targeted program in its full context, viewing it as it actually operates in its setting, including other programs similar in purpose and function. If the set of programs together comprise a mosaic that is neutral with regards to religion, then the Establishment Clause is not offended. The program’s mission and means pose *465 questions of fact, subsidiary to the ultimate question of whether the school district has impermissibly preferred religion over non-religion, which preclude the grant of summary judgment. Although we reverse the grant of summary judgment and remand for trial, we discuss the record both to locate the genuine issues of material fact and to provide guidance to the district court, reminding that standing must be demonstrated at all stages, including trial.
I
The plan presents a novel configuration of Establishment Clause issues. In 1996, the Beaumont Independent School District instituted a volunteer program in its elementary and middle schools called “Clergy in the Schools.” The District solicited volunteers from area clergy of all local faiths, the majority of which are Protestant Christian. Participants conducted group counseling on secular issues including race, divorce, peer pressure, discipline, and drugs. The program’s stated goals were to provide (1) meaningful dialogue between the clergy and students regarding civic values and morality; (2) a safe school atmosphere; and (3) volunteer opportunities.
Well aware that it was walking a legal high wire, the District took several steps to avoid constitutional concerns regarding the content of the counseling sessions. It schooled the clergy regarding legal strictures, instructing them not to wear clerical garb, identify their religious affiliations, engage in religious discussions, or quote the Bible. Requests for prayer were to be deflected to outside of the school. The District also prohibited discussions regarding sex or abortion. School officials attended the meetings along with the clergy and students.[2]
Participation by students in the program was voluntary, although no parental consent was required. Students who wished to participate could do so, but participation was also solicited on a random basis. The record is unclear regarding that mix. The record is also unclear as to the numbers of students participating: at the program’s inception, it was to involve one or two visits to each school per year with about 35 students per session.
The plaintiffs presented several facts in support of their claim that the program sought to create a stronger school-church bond. Superintendent Carrol Thomas, who initiated the program, at one time advocated a need for prayer in schools. At the first training session for the program, the PTA president distributed a leaflet entitled, “Reasons for a Church-School Alliance.” After the filing of the Does’ Complaint, the District sent a letter to the volunteers clarifying that the goals expressed in the leaflet were not part of the program. One volunteer quoted the Bible at a counseling session. In response, the District prepared a “Fact Sheet” for the volunteers reciting the secular nature of the program. Outside of the school, the clergy prayed together before the counseling sessions, and Superintendent Thomas asked them to preach about substance abuse in their worship services and to help prepare students for the Texas standardized examinations.
The record reflects a number of volunteer opportunities for adults, which are administered through its “School Volunteer Program.” Those programs include a sorority which conducts fairs and a child safety program; several corporate volunteer programs; senior citizen volunteering, some of which includes mentoring; and *466 DARE, an anti-drag program involving police officers. There are also volunteer programs involving mentoring funded by sources outside the Beaumont public schools. From the record it is difficult to decide as a matter of law whether these opportunities provide services to the students that are comparable to the counseling and mentoring featured in the clergy program.
Before the District initiated the program, one of the parent plaintiffs read about the program in the newspaper. She requested that the District integrate professionals from secular counseling professions into- the program. After the District refused her request, she and the other Doe plaintiffs brought suit to enjoin the program from going forward. They alleged that it violated the Establishment Clause of the First Amendment as well as the Texas Constitution. The district court denied a temporary restraining order. Later, on cross-motions for summary judgment, the district court granted summary judgment to the District, holding that the plaintiffs lacked standing and, alternatively, that the program did not violate the Establishment Clause. The Doe plaintiffs appealed to a panel of this court, which reversed the district court. The District then sought en banc review, which we granted.
II
Article III of the U.S. Constitution requires that a litigant have standing to invoke the power of a federal court. The focus of standing is on the parties’ right to have the court decide the merits of the dispute.[3] To demonstrate standing, the plaintiff must show an “injury in fact,” a requirement assuring that the court will not “pass upon ... abstract, intellectual problems, but will adjudicate concrete, living contestfs] between adversaries.”[4] The injury alleged must be actual or imminent and not abstract, conjectural, or hypothetical.[5]
By insisting that a plaintiff have a personal stake — an individuated interest rather than an interest in good government shared by all citizens — Article III avoids enlisting federal courts in policy exercises about how the government operates. This insistence vindicates principles of separation of powers and federalism by closing the doors to those who would only entreat the court to superintend the legal compliance of the other branches and the states. For example, in Valley Forge Christian College, the plaintiffs learned of the federal government’s conveyance of property to a religious institution in another state. Those plaintiffs had no relationship to the government action at issue other than an interest in seeing the law enforced.[6] They had suffered no injury from any unconstitutional acts not suffered by all citizens.
At the same time, the fact that many persons suffer an injury does not mean that no person has suffered the requisite injury.[7] Plaintiffs have standing to assert, for example, that their use or enjoyment of a public facility is impaired by an alleged violation of the Establishment Clause.[8]
Such a claim of standing is even stronger when the plaintiffs are students and parents of students attending public schools. Students and their parents enjoy *467 a cluster of rights vis-á-vis their schools — a relationship which removes them from the sphere of “concerned bystanders.”[9] The Supreme Court has recognized that students have a judicially cognizable interest in a right to receive an education in a racially integrated school.[10] Similarly, the Court has repeatedly stated the right of children and their parents to receive public education that is compliant with the First Amendment’s Establishment Clause.[11] This is not to suggest that children and their parents need not have an individuated injury. Rather, the point is that they have often been found to have suffered an injury, albeit along with many other students and parents.
In this case, the question of standing was initially framed by the District’s contention that the option not to participate in the program deprives the Does of a cognizable injury. In response, the panel opinion concluded that the threat of exposure to random summons to the program was a sufficient injury. We need not return to that joust: standing may be supported by more direct reasons. Of course, the parties cannot confíne our inquiry into standing to the initial field of engagement. We must satisfy ourselves of our own and the district court’s jurisdiction, even if the parties are prepared to concede standing.[12]
The District’s characterization of standing fails to grasp the full harm of which the plaintiffs complain. The Does have asked that this effort to enrich the curriculum be modified so that they may participate. There is little doubt that limiting access to the full curriculum offered by the school would injure these students.[13]
In sum, there is standing beyond the Does’ status as students or parents of students at the school.[14] Opportunities for counseling and mentoring services are a needed and valued component of public education. The District supported this mentoring program with its money and resources. At bottom, the claim is that the program unconstitutionally prefers religion over non-religion, that the students cannot participate in the school’s offered program without taking part in an unconstitutional practice. If found at trial, this works a deprivation of a student’s right not to be excluded from the benefits of a school-financed educational offering — a concrete, judicially cognizable injury.
*468 III
In evaluating the merits of the Doe plaintiffs’ Establishment Clause claim,[15] we consider their allegations in light of three lines of analysis developed by the Supreme Court. First, the three-part inquiry of Lemon v. Kurtzman asks (1) whether the purpose of the practice is not secular; (2) whether the program’s primary effect advances or inhibits religion; and (3) whether the program fosters an excessive government entanglement with religion.[16] The second test, the “coercion” test, measures whether the government has directed a formal religious exercise in such a way as to oblige the participation of objectors.[17] The final test, the “endorsement” test, prohibits the government from conveying or attempting to convey a message that religion is preferred over non-religion.[18] We will apply the latter two tests to the program’s effects, rather than its purpose or structure, thus focusing on the plaintiffs’ strongest contention that the program is non-neutral.
A
Under Lemon, we first analyze whether the Clergy in the Schools program had a secular purpose.[19] Courts normally defer to a government’s statement of secular purpose. That purpose, however, must be sincere and not a sham.[20]
The District’s stated purposes of the program — to provide dialogue between the clergy and students regarding civic values and morality, a safe school atmosphere, and volunteer opportunities — are secular goals. It is permissible for a school to promote discussions on morality, safety, and volunteering from the community. That these goals may overlap with some religious views is of no moment.[21]
The Does suggest that the stated purposes are a sham, pointing to Superintendent Thomas’s statement that prayer is needed in schools; the church-school alliance leaflet distributed to the volunteers; the District’s encouragement of volunteers to provide counseling and tutoring in their churches; the prayers conducted by the volunteers at their pre-counseling meetings; and the Bible quotation used by one of the volunteers at a student session.
We are not persuaded that these indicia are sufficient to demonstrate as a matter of law that the purpose of the Program was not secular. Superintendent Thomas’s requests regarding tutoring and prayer at church, as well as the volunteers’ prayers before meetings, were not part of the program and the summary judgment record indicates no hidden purpose in conducting it. The record does demonstrate that following the two violations of the program’s stated goal — the PTA president’s distribution of the information sheet and the Bible quotation used by one of the volunteers — the District sent out literature to the volunteers clarifying the secular purposes of the program.
In reaching its conclusion that the program exhibited an impermissible purpose, the principal dissent relies on several *469 statements it claims were made in disseminated “pamphlets,” “informational materials,” and “publicity.” Again, the principal dissent’s enthusiasm runs ahead of the record. The quoted language regarding “doing the right thing” and the benefits of volunteering for the clergy in their vocations comes from a document entitled “Meeting with Ministers,” an agenda sheet for the program’s orientation. There is no evidence in the record that this sheet was even distributed. The statements contained in the agenda sheet were listed not under the “Goals” heading of the agenda, but under “Expect[at]ions.” More importantly, they were cited not as purposes, but as indications of what the clergy could expect from participation.[22] The principal dissent’s finding of an impermissible purpose cannot be made as a matter of law, if at all. There is no impermissible purpose in pointing out to potential volunteers the benefits they can expect or in relating how valuable their participation will be. Few would deny the difficulty of recruiting volunteers for schools.
The principal dissent is left with citing the exclusivity of the clergy program as expressing an impermissible purpose. Unsatisfied with testimony that the District’s volunteer programs are routinely grouped around a vocational, corporate, or social affiliation, and that the clergy were tapped because of their collective experience with listening to problems and talking to groups, the principal dissent pieces together a quotation from Joy James, the District’s volunteer coordinator, and interprets it to mean that the District believes clergy have unique substantive experience in the field of morals. James, however, specifically denied that the purpose of separation was to convey any special message “that only clergy can convey.” Moreover, the District s encouragement of people from all walks of life to participate in various other mentoring programs rebuts the dissent’s conjecture. We cannot find here as a matter of law that the stated purposes of the program were not permissible or pretextual. Thus, we cannot find as a matter of law that the program ran afoul of the purpose prong of Lemon. We leave this issue for trial. The parties may adduce such evidence as they can bearing on the question of whether the stated purposes were pretext.
B
The second prong of Lemon examines whether the program at issue has the primary effect of advancing or inhibiting religion.[23] The Court has identified several types of impermissible effects. Two are relevant here. First, we ask whether the program will cause state-sponsored inculcation of religious beliefs.[24] In the context of this program, this inquiry dovetails with the coercion test of Lee v. Weisman, asking whether the District has directed a religious activity in such a way as to compel participation.[25] These impermissible effects turn on whether the Program encourages religious indoctrination or involves religious services.
The Supreme Court has assumed that a religious organization may be unable to follow the secular guidelines of a program only if the organization is “pervasively sectarian.” [26] An interfaith group of clergy in the program’s setting is not “pervasively sectarian.” The volunteers are working in a secular setting with other volunteers who subscribe to different faiths. Thus, we presume that the volunteers will comply with the program’s secular guidelines. The plaintiffs’ only evidence to the con *470 trary, the Bible quotation by one volunteer, is not sufficient to demonstrate state-sponsored inculcation.
Similarly, because the counseling does not constitute a religious exercise, the Program does not violate the coercion test. We cannot imply from the presence of a minister that the message cannot be secular — a commonsense observation that is also the law. If no religious activity is at issue, any speculation as to whether students might feel pressured to participate is irrelevant. We conclude that the summary judgment record does not support a conclusion that the program violates the coercion test.
We turn to the second group of impermissible effects: the core question of non-neutrality. The Court has required that a government allocate benefits among secular and religious organizations in a neutral manner.[27] A non-neutral program is impermissible because it could convey the message that the religion-oriented recipients are uniquely qualified to carry out those services.[28] Put another way, it is impermissible for the government to “endorse” religion by conveying a message that religion is preferred over non-religion.[29]
Apart from the principal dissent’s disagreement with the majority’s reading of the record,[30] the central disagreement among the three opinions today is how we should measure the constitutional significance of a program whose potential non-neutrality or endorsement stems only from its symbolic affiliation. This is not a case involving devotional activities, proselytization, or benefits to religion. We are presented with a symbolism case, but a unique version of one: one whose symbolism draws not from a visual symbol, as in Allegheny v. ACLU, but from a government-sponsored activity.
This difference presents some analytical difficulty, which both dissents — while reaching opposed results — summarily dismiss. Judge Jones would exclude the symbolic import of a group of clergy from the Establishment Clause analysis altogether.[31] The principal dissent seizes upon the notion that “each decisional element” must be scrutinized for constitutional failing but never bothers to analyze what constitutes such a decisional element.
A government-sponsored activity such as a volunteer program may indicate non-neutrality or endorsement. The key question is in what context we assess that activity — by a narrow examination of each individual extracurricular program, or from the perspective of the District’s entire menu of volunteer mentoring and counseling programs. The Supreme Court has allowed clerical figures to perform secular duties as long as the government neutrally allowed those duties to be performed *471 by secular or religious figures.[32] The District argues that it allows and sponsors mentoring opportunities for both religious and secular figures.
The principal dissent would have us look only at the clergy program in answering the question of neutrality. We are assessing a school’s volunteer program, however, not analyzing a statutory scheme. While a statute addressing a particular matter is presumably the legislature’s comprehensive treatment of that topic, the District’s volunteer programs seem to be more piecemeal and organized around groups of volunteers. For example, the DARE program is organized around the participation of local police officers, not as the District’s last word on the prevention of substance abuse. Thus, the District’s grouping of clergy does not appear to be a limit upon mentoring or counseling volunteer opportunities of other groups. Looking at the District’s policies in light of its entire volunteer program, we cannot say as a matter of law that the program is not neutral with respect to religion.
This record, developed as it was on limited summary proceedings, lacks sufficient detail regarding the overall set of volunteer programs operated by the District to sustain a summary judgment in either direction. We therefore leave this issue for trial and instruct the district court to consider the entire set of volunteer programs operated by the District — including, but not limited to the “Clergy in the Schools” program — in answering the question of whether the District preferred religion over nonreligion.
The endorsement analysis under Allegheny, which begins with the element that carries religious symbolism, also requires us to examine the volunteer program as a whole. In a visual display, every element carries with it complete symbolic content. The elements are prototypical symbols, conveying a whole message within a single visual marker. In our case, an individual clergy member, wearing no vestments and untitled, is not a symbol. Instead, the most basic symbolic element in our case is the clergy’s presence as a counseling group. We agree with the Does that the presence of a group of clergy participating in a program called “Clergy in the Schools” carries some symbolic weight. Even if the clergy do not wear their clerical vestments, the program suggests that they have been chosen as a group because of a perceived expertise in the fields of civic values and morals.
Again, we look at that symbol not in a vacuum, however, but within its relevant context. In Allegheny, the Court did not focus on a government’s decision to display a Chanukah menorah in isolation, but considered it within the context of the government’s inclusion of other elements including a Christmas tree and a sign saluting liberty.[33] The Court determined that the particular setting “negated” any message of endorsement of religion.[34]
C
The Lemon test’s third prong bars excessive entanglement.[35] Administrative cooperation alone does not constitute such a violation. Only programs that require “pervasive monitoring” run afoul of the Establishment Clause.[36] The Court has *472 held that to require from religious officials the performance of administrative duties consistent with and not more onerous than those required from non-religious officials in analogous programs does not constitute excessive entanglement.[37]
In Agostini v. Felton, the Court found no excessive entanglement where a school district sending public school teachers to parochial schools under Title I provided training regarding the secular nature of the program, required the removal of religious symbols from private school classrooms, and made unannounced visits to classrooms about once a month.[38] The program here is very similar to the controls in Agostini in terms of training and visual symbols. The monitoring requirement could be characterized as “pervasive” because an administrator attends every session, rather than attending sporadically. Because the District monitors all of its volunteer programs, however, that supervision imposes no unique administrative burdens. That the District sent a mailing soliciting the clergy volunteers appears to have been a function of having no existing umbrella organization rather than an administrative need occasioned by the volunteers’ religious professions. In the absence of a need for the District to undertake measures it does not follow with respect to other programs, we find no excessive entanglement.
IV
Establishment Clause analysis requires that we be sensitive to the context and circumstances attending each case.[39] If the clergy program is fairly viewed, on a fully developed record, as part of a larger framework of secular mentoring and counseling programs, it has not run afoul of the Establishment Clause. Here, the very simplicity of mixing the clergy with others occasions the need for a fact finder’s settlement of the reasons for the District’s rejection of that solution. The record evidence leaves us with a blurred picture of the District’s volunteer program as a whole. It is unclear whether the mentoring in other programs is narrow in scope, or whether it reaches to a meaningful degree the broader counseling emphasized in the clergy program. This question is not properly answered by merely considering the names of other programs or the groups invited to participate. When an athlete comes, for example, to speak to students about athletic achievement, that discussion can be thin or thick. It can be a simple discussion of winning techniques for a specific sport, or it can emphasize larger themes of teamwork, self-discipline, goal setting, truth telling, giving, relationships, and hard work; values the “clergy” must also teach. Their very kindred nature would belie a preference for religion over nonreligion — unless the district effectively took the tack that only preachers can teach this subject.
We cannot conclude as a matter of law that there is an absence of genuine issues of material fact so as to sustain a grant of summary judgment for either party on the question of whether the District is preferring religion over non-religion. The district court may find that only the clergy are invited to imbue these values, that other programs differ in both mission and means, or it may find that other professions similarly engage the students, through the unique lens of their respective professions by active mentoring through the powerful presence of lives well lived. That the perspectives of the different programs differ is not a touchstone of invalidity. To the contrary, the District urges that it seeks the differing perspectives upon common values and civic virtues — a quest that will produce different looks for *473 the components of a larger program. A trial must sort out these assertions of fact.
V
Facts decide cases at every level and of all types. That a case or controversy has no disputed questions of fact does not undercut this statement. Nor is there some exception for cases of public interest or for cases perceived by some measure to be more important than others. No member of this Court would openly decide questions of law that were not before the Court as part of a case or controversy. This does not mean that it does not happen; without a sound resolution of fact, this “case or controversy” remains undefined, leaving its opinions to read like essays or editorials about schools and religion. The dry legal observation that an opinion fails to accept genuine issues of material fact conceals its profound consequences. Facts and their resolution lie too close to the heart of the judicial function to treat them as little more than pieces of an erector set — available for use in a writer’s envisioned design.
This leaves bench and bar to puzzle over what we have held today. It is difficult because the opinions either soar past the record or delve into its meager content for any inference, not unlike an advocate preparing a closing argument. Nonetheless, the principal dissent and this opinion share important common ground. We agree that the summary judgment must be reversed and the case remanded for trial, although the principal dissent would go further, reversing and rendering judgment.
We agree that the ultimate question is whether the school district impermissibly preferred religion over non-religion. This agreement reflects our overarching agreement that the school district owes a duty to be evenhanded in its policies toward religion and non-religion, a duty of equality. Relatedly, we agree that context is critical in assessing neutrality. We agree with the principal dissent’s observation that, “had the school district offered and factually supported a legitimate alternative explanation for its clergy only recruitment policy, it would have created a genuine issue' of material fact, making a remand necessary.” At the same time, this statement frames the difference between our view and that of the dissenting opinion. We say the record does provide that context, and the principal dissent says it does not.
The principal dissent makes our point that this case must be tried. Each of its arguments rest on a starting premise of the facts. For example, in assessing whether the program has a secular purpose, the principal dissent determines the question of fact on appeal finding that there is no such fit. It then lays its accent upon the failure of the district to include other professionals in the single program it would examine. In short, virtually all of the flaws with the program found by the principal dissent flow from its willingness to accept as fact with no trial that this was a single stand-alone program with no relevant kinship to the other programs. With respect, asserting that the other programs are not relevant begs the basic fact question of the fit of the clergy program into the larger scheme of providing outside mentoring opportunities.
We reverse the grant of summary judgment and remand to the Chief Judge of the Eastern District of Texas for further proceedings, including trial if necessary.
REVERSED AND REMANDED.

. We refer to Judge Wiener's opinion concurring in part and dissenting in part as the principal dissent because it expresses the view of the largest number of dissenting judges.

. The principal dissent's recitations regarding these administrative matters are contrary to the record. The record reflects that the school selects student participants for some of its programs (for example, the fraternity program participants are recommended by teachers) and conducts some programs in small groups (the Junior League’s activities, for example, may involve whole classrooms or smaller groups, depending on the teacher's wishes). According to the District’s volunteer coordinator, every program involves oversight by school officials.

. See Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

. See Federal Election Comm’n v. Akins, 524 U.S. 11, 20, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (internal quotations omitted).

. See Friends of the Earth, Inc. v. Laidlaw Envtl. Serv’s, Inc., 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000).

. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 485-86, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

. See Akins, 118 S.Ct. at 1786.

. See Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir.1989); Hawley v. City of Cleveland, 773 F.2d 736, 740 (6th Cir.1985).

. See Bell v. Little Axe Indep. Sch. Dist. No. 70, 766 F.2d 1391, 1398 (10th Cir.1985) (holding that parents have standing to allege that the state acts unconstitutionally to establish a religious preference).

. See Allen v. Wright, 468 U.S. 737, 756, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

. See School Dist. of Abington Township v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); People ex rel. McCollum v. Board of Educ., 333 U.S. 203, 206, 68 S.Ct. 461, 92 L.Ed. 649 (1948).

. See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).

. We are persuaded that pleading and proof of the Does’ standing were offered. The District initially moved to dismiss for lacking of standing as a Rule 12(b)(6) motion. That motion was still pending when the District moved for summary judgment. The district court by separate order decided that the filing of the motion for summary judgment mooted the Rule 12 motion. The question of standing was then joined in the summary judgment motion. The Does replied to the motion for summary judgment by attaching submissions made at an earlier hearing on application for a temporary restraining order, including a transcript of the oral testimony of one parent and three affidavits of others. As we read the affidavits, the parents sought the benefits of a quality program and believed there were no other programs offering comparable mentoring opportunities. We need not impose that contention on them; at trial, the individuals can state their own testimony and, in proving their standing, quell disagreement over the reading of the summary judgment record.

.Cf. Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 408 (5th Cir.1995) (student had no standing to protest the Gideons’ leaving Bibles on a table in a foyer in a building housing lower grades than the plaintiff's grade, a building which she never would have entered).

. As the district court made no determination as to plaintiffs' claims that the Program violated the Texas Constitution, we do not do so here.

. 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

. See Lee v. Weisman, 505 U.S. 577, 586, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

. See County of Allegheny v. ACLU, 492 U.S. 573, 592-93, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

. See Edwards v. Aguillard, 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); Lemon, 403 U.S. at 612, 91 S.Ct. 2105.

. Edwards, 482 U.S. at 586-87, 107 S.Ct. 2573.

. See Bowen v. Kendrick, 487 U.S. 589, 612-13, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988).

. The other listed ''expect[at]ions” were morning meetings, visits to different schools in different months, and a timetable for participation.

. See Lemon, 403 U.S. at 612, 91 S.Ct. 2105.

. See Agostini v. Felton, 521 U.S. 203, 223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

. See Lee, 505 U.S. at 586, 112 S.Ct. 2649.

. See Bowen, 487 U.S. at 612, 108 S.Ct. 2562.

. See Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 2541, 147 L.Ed.2d 660 (2000) (plurality) ("[W]e have consistently turned to the principle of neutrality.”); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 842, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (discussing religion-neutral criteria); Bowen, 487 U.S. at 605, 108 S.Ct. 2562.

. See Bowen, 487 U.S. at 604-05, 108 S.Ct. 2562 (permitting aid distributed neutrally among secular and religious organizations and not suggesting superiority of religious groups).

. See Allegheny, 492 U.S. at 593, 109 S.Ct. 3086.

. Standing alone, that disagreement would warrant a remand — not, as the dissent urges, summary judgment in favor of the Does. The dissent argues that all reasonable inferences should be construed in favor of the Does, but that rule extends only to reviewing the summary judgment in favor of the District, not to reversing and granting summary judgment to the Does.

. We are unsure of what rule Judge Jones’ dissent would advance. At parts, it seems to contend that the program was permissible regardless of the context in which it was offered. At others, it appears to accept that the program's legality hinges on the presence of other volunteer programs.

. See Bowen, 487 U.S. at 613, 108 S.Ct. 2562; Roemer v. Board of Public Works, 426 U.S. 736, 745-46, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976).

. Allegheny, 492 U.S. at 598-600, 614-18, 109 S.Ct. 3086.

. Id. at 595, 109 S.Ct. 3086. As Justice O’Connor points out in her concurrence in Allegheny, the setting does not neutralize the object’s religious significance; rather, it "changes what viewers may fairly understand to be the purpose of the display.” Id. at 635, 109 S.Ct. 3086 (O’Connor, J., concurring) (citations omitted).

. See Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105.

. See Agostini, 521 U.S. at 232-34, 117 S.Ct. 1997.

. See Roemer, 426 U.S. at 764, 96 S.Ct. 2337.

. Agostini, 117 S.Ct. 1997

.See Allegheny, 492 U.S. at 636-37, 109 S.Ct. 3086 (O’Connor, J., concurring).