**Tom OXFORD, Individually and as Next Friend of Brett Oxford and Ryan Oxford, Minor Children; Debra Barry, Individually and as Next Friend of Avian Barry, Minor Grandchild, Plaintiffs,**

v.

**BEAUMONT INDEPENDENT SCHOOL DISTRICT, Defendant.**

No. 1:96–CV–706.

United States District Court, E.D. Texas, Beaumont Division.

Aug. 29, 2002.

Scott David Newar, of Houston, TX, for Plaintiffs.

Tanner Truett Hunt, Jr. and Melody G. Thomas of Wells, Payton, Greenberg & Hunt, Beaumont, TX, for Defendants.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

SCHELL, District Judge.

## I. BACKGROUND AND SUMMARY OF TESTIMONY

This case involves a constitutional challenge to the Beaumont Independent School District's ("BISD") "Clergy in Schools" ("CIS") program, which, beginning in September 1996, placed clerical volunteers from the Beaumont community in BISD's primary and secondary schools to counsel and mentor students on secular topics. To begin, the court will provide a brief overview of the CIS program and its attendant safeguards.

BISD's superintendent, Dr. Carrol Thomas, and assistant superintendent for secondary schools, Beth Fischenich, created the CIS program in 1996 with three main goals in mind: to provide (1) meaningful dialogue between the clergy and students regarding civic values and morality; (2) a safe school atmosphere; and (3) volunteer opportunities for additional stakeholders in the schools. Def.'s Ex. 4. BISD recruited volunteers for CIS from area clergy representing nearly all local faiths, although the majority of participants were Protestant Christian. *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 465 (5th Cir.2001). The clergy volunteers for the program received volunteer guidelines from BISD similar to those dispensed to all school volunteers, but, because of possible legal implications arising from the entry of clerics into public schools, BISD specifically cautioned the CIS participants to refrain from discussing several potentially sensitive topics. "[V]olunteers were instructed that there would be no discussion of religion, church affiliation, or church services." Def.'s Post–Trial Memo. at 2. BISD also prohibited discussions about sex, abortion, and prayer. Moreover, BISD instructed volunteers not to wear clothing that would show their affiliation with a particular church or religion. *Id.* However, the trial record reflects a few instances where participating clergy veered away from BISD's secular mandates by wearing clerical garb to CIS sessions, quoting from the Bible, promoting prayer, and encouraging students to develop a strong relationship with God. *See* Pls.' Post–Trial Memo. at 8 (citing the testimony of several witnesses).

The CIS program entered thirty-one BISD schools—nineteen elementary schools, seven middle schools, three high schools, and two alternative schools—and was offered to students in grades three through twelve. Clergy met with groups of students at least once per year in each elementary school and at least twice per year in each secondary school. Def.'s Ex. 4. Student participation in CIS was voluntary according to BISD witnesses, al-

though principals and counselors at each school selected and invited some students to participate in the program.[1] At least one BISD school solicited student participation in CIS by announcing upcoming sessions over the school loudspeaker. In the CIS sessions, approximately two to five clergy counseled anywhere from twenty-five to thirty-five students on various secular topics.[2] To help facilitate discussion and oversee the program, either a principal, counselor, assistant principal, or some other administrative employee of BISD attended each CIS session.

Near the time of the program's inception, Plaintiffs, then comprised of current Plaintiffs Debra Barry and Avian Barry ("Avian"), along with other individuals who are no longer parties to this action, and other civic groups objected to the CIS program and requested that BISD integrate the program to include lay professional counselors. BISD administrators considered but rejected such overtures. As a result, on November 18, 1996, Plaintiffs brought suit in the U.S. District Court for the Eastern District of Texas, Beaumont Division, alleging that CIS violated the Establishment Clause of the First Amendment to the United States Constitution, and Article I, sections 6 and 7 of the Texas Constitution. The case was assigned to the Honorable Joe J. Fisher. Thereafter, Judge Fisher signed an order granting summary judgment in favor of BISD on April 2, 1997. On April 16, 1999, a Fifth Circuit panel consisting of Judges Wiener, Benavides and Garza reversed Judge Fisher's summary judgment and rendered judgment for Plaintiffs, holding that the CIS program violated the Establishment Clause.

Subsequently, BISD filed a petition for rehearing en banc, which the Fifth Circuit granted. On January 26, 2001, the Fifth Circuit handed down its en banc decision in a somewhat fractured opinion. Nine judges on the fifteen judge panel opined that Plaintiffs had standing to invoke the jurisdiction of the court. *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 466–67, 482 (5th Cir.2001). Of those nine judges, only three, considered the "Controlling Minority"—Judges Higginbotham, King, and Davis (hereinafter "controlling minority")—also found the existence of genuine issues of material fact and reversed and remanded the case to this court. *Id.* at 462–73 (Judge Higginbotham authored the controlling minority opinion). The six additional judges who approved of standing—Judges Wiener, Politz, Benavides, Stewart, Parker, and Dennis—determined that CIS was unconstitutional. *Id.* at 482–99. The remaining six judges sitting on the panel—Judges Jolly, Jones, Smith, Barksdale, Garza, and DeMoss—objected on standing grounds to the controlling minority's reversal of Judge Fisher's decision. *Id.* at 473–79. Of those six, five dissented separately and decided that CIS was constitutional. *Id.* at 479–82 (excluding Judge Jolly who abstained on the merits). Notwithstanding the relatively small number of Fifth Circuit judges who suggested remand, the court must follow the controlling minority opinion as "there is no majority legal rationale to follow." *Id.* at 479 (Jones, J., dissenting).

---

1. BISD's Coordinator of Guidance, Marilyn Hebert, testified that BISD had no record of the total number of students who participated in CIS or any breakdown of the number of students who volunteered outright to participate in CIS as opposed to the number who were recruited or prompted by school officials to participate.

2. Defendant's Exhibit number 4, which is BISD's CIS "Fact Sheet," states that each counseling session involved 30 to 35 students. However, Marilyn Hebert testified that there were usually 25 to 30 students in a session.

Accordingly, the Fifth Circuit remanded the case to this court with instructions to conduct "further proceedings, including trial if necessary," to further develop the record and resolve certain fact issues. *Id.* at 473. The Fifth Circuit instructed this court to examine the CIS program in the context of other programs provided by BISD that are similar in "mission and means." *Id.* at 464. Thus, pursuant to the Fifth Circuit's directive, the court must examine other programs that provided counseling and mentoring opportunities to BISD students on secular subjects analogous to those covered by CIS. The court must then determine the constitutionality of CIS by applying the three tests discussed in the Fifth Circuit's opinion.

On May 30, 2001, Plaintiffs' filed a first amended complaint, which added current Plaintiffs Tom Oxford and his two children, Brett and Ryan, to this civil action. In mid-August 2001, BISD expanded CIS from being clergy only to include non-clergy counselors and mentors, and changed the title from CIS to "Clergy, Corporations, Concerned Citizens: Key Communicators" ("Key Communicators"), which is precisely the type of program adjustment Plaintiffs and others requested back in 1996. Unlike CIS, "Key Communicators" is open to all Beaumont community leaders and covers secondary school students only. Def.'s Ex. 34 at unnumbered 3 (stating that the panel of mentors will be diversified).

The court conducted a non-jury trial beginning on September 10, 2001 to resolve factual issues set forth in the Fifth Circuit's opinion, and, ultimately, to test the constitutionality of CIS. During the trial, the court received over 200 exhibits and heard from the following witnesses, who are listed below in the order in which they testified:

(1) Marilyn Hebert—BISD's Coordinator of Guidance: Ms. Hebert compared CIS to other BISD volunteer programs such as Dug Abuse Resistance Education ("D.A.R.E."), a program about the ills of drugs, alcohol, and tobacco administered by local police officers and sheriff deputies for fourth, fifth, and seventh graders; and "C.H.I.C.K.E.N. Club," [3] involving a rally, along with a poster and essay contest for fourth and fifth graders.

(2) Beth Fischenich—BISD's Assistant Superintendent for Secondary Schools: Ms. Fischenich testified about her involvement in the process of creating CIS in 1996. She also explained that Dr. Thomas expanded CIS to include non-clergy volunteers with counseling skills after clergy participation in CIS decreased in 2000–01.

(3) Tom Oxford—added as Plaintiff on May 30, 2001, and father of two BISD students who attended BISD schools in third and seventh grades during the 2000–01 school year: Although Mr. Oxford's children did not participate in CIS, he objected to the program because he believes a clergy only mentoring program sent the message that the government endorsed religion. One of his children heard CIS announcements over the loudspeaker in his school each year.

(4) Reverend Will Stambaugh—a Presbyterian Minister: Rev. Stambaugh was asked to participate in CIS in 1996, but declined to do so because he felt the program unlawfully endorsed religion and excluded non-religious and, more specifically, non-Christian children from participation. He sent a letter to Dr. Thomas suggesting that CIS be modified to include non-clergy

---

**3.** "C.H.I.C.K.E.N." is an acronym for "Cool, Honest, Intelligent, Clear-headed, Keen, Energetic, Not on drugs."

civic leaders, but received no response. Pls.' Ex. 45.

(5) Dr. James Fuller—Senior Pastor of Calder Baptist Church in Beaumont, Texas, and CIS volunteer: Dr. Fuller thought the CIS program should embrace non-clergy, but participated nonetheless. He acknowledged that several clergy wore clerical collars to CIS sessions and recalled at least three incidents where clergy repeated quotes from the Bible, or made reference to prayer or religion during CIS. Furthermore, Dr. Fuller recounted a conversation he had with Dr. Thomas about why only clergy were allowed to participate in CIS. According to Dr. Fuller, Dr. Thomas relayed to him that he felt including non-clergy in CIS was unnecessary for the program to pass legal muster and that some of the ministers in Beaumont wanted clergy to undertake the program alone for fear that their positive impact would be diminished otherwise. The topics he recalls being discussed at CIS sessions included peer pressure, cheating, violence, safety in schools, drugs, race relations, and family situations such as divorce.

(6) Reverend Oveal Walker—Pastor of Mount Calvary Baptist Church in Beaumont, Texas, as well as CIS volunteer and program co-chair: Rev. Walker testified that CIS should not be diluted with non-clergy because clergy counselors provided an "intangible benefit" to students. He indicated that part of this benefit was derived from the excitement of school children before CIS sessions when they heard that "the preachers [were] coming to talk" to them. He agrees that lay counselors may be equally capable of talking to students about their problems, but he believes that students open up more to clergy for reasons he cannot explain. He also testified that because other professional groups and organizations were allowed to develop and offer their own programs to assist BISD students, clergy should be able to do

the same. Rev. Walker recounted some of the topics discussed at the CIS counseling sessions he attended: violence, racism, motivation to do homework, evil, teen pregnancy, obeying teachers, and loving parents.

(7) Emily Eisen—now a high school student, she was asked to participate in CIS by a school counselor when she was a student at Regina Howell Elementary School: Ms. Eisen stated that she was asked to participate in CIS because her parents were divorcing at the time. She also testified that one of the clergy at the session she attended wore clerical garb and specifically inquired into her relationship with God and asked about her prayer habits. Ms. Eisen testified that those questions made her feel awkward.

(8) Joy James—Coordinator of School Volunteers and School Business Partnerships for BISD: Joy James testified that, although she oversaw many school volunteer programs, she was not involved with CIS. She reported the total number of BISD volunteers per year and gave a verbal rundown of other volunteer programs including "Special Friends," "Crossing the Line," "Kids on the Block," and others. The court will outline each program below and discuss Joy James's testimony more fully when comparing the programs to CIS in mission and means.

(9) Dr. Thomas—BISD Superintendent of Schools, hired in late 1995, and began work in March 1996: Dr. Thomas said that, to his knowledge, parental consent for participation in CIS was always required at individual host schools. He did not know whether the requirement was always enforced. He also mentioned that CIS was kept clergy-exclusive at the request of some members of the clergy. Dr. Thomas described the new "Key Communicators" program as playing the same role that CIS did, with the addition of volun-

teer counselors and mentors from other occupations.

(10) Reverend Mike Thompson—Minister at the Spindeltop Unitarian Church in Beaumont from 1994–2000: Rev. Thompson noted how he and Rabbi Peter Hyman objected to the nature of the CIS counseling program at its inception because it included clergy only. He was especially suspicious of its mission because he had previously heard Dr. Thomas declare his belief that religion should be brought back into public schools. Rev. Thompson declined an invitation to participate in CIS as he felt it was unconstitutional.

(11) Dr. Dov Lieberman—Associate Professor of Educational Psychology at the University of Houston: Dr. Lieberman testified that a clergy only counseling program sends the message to elementary, middle school, and high school students that BISD endorses religion and that students should turn to clergy for answers to their problems. He believes this message was clear even though most of the discussion involved purely secular subjects.

(12) Debra Barry—Plaintiff and caretaker of Avian, who was in the fourth grade during the 2001–02 school year: Debra Barry testified that she should have a voice in whether Avian receives any counseling and mentoring from clergy. However, she did not believe Avian had ever participated in a CIS session and did not know whether Avian was ever solicited to participate in CIS.

(13) Priscilla Rouse—Counselor at Regina Howell Elementary School: Ms. Rouse testified that teachers picked students in fourth and fifth grades and invited them to participate in CIS sessions. Once the students agreed to participate, Ms. Rouse sent home parental permission forms to be signed. She also stated that Ms. Eisen volunteered for a CIS session and her parents consented. She recalls that fourth and fifth grade students had questions about drugs, gangs, violence, and friendships. She stated that the CIS sessions she attended did not involve any discussion of religion.

The court must now proceed to analyze the facts and evidence elicited at trial in the context of the dictates promulgated by the Fifth Circuit. To best accomplish this analysis, the court first will reiterate the Fifth Circuit's framing of the constitutional issue. This opinion will then examine Plaintiffs' standing to bring this suit, and discuss fact issues raised by the Fifth Circuit and resolved at trial, including a comparison of CIS to BISD's other volunteer programs. The court will also perform a constitutional analysis under the three tests employed in the Fifth Circuit's opinion.

## II. ANALYSIS CONSISTENT WITH THE FIFTH CIRCUIT'S OPINION

The controlling minority opinion from the Fifth Circuit instructs that "the ultimate question in this Establishment Clause case is equality of treatment": whether BISD impermissibly preferred religion over non-religion. *Beaumont Indep. School Dist.*, 240 F.3d at 464, 473. Also at issue are several subsidiary factual and legal issues, but the Fifth Circuit makes clear that the constitutionality of CIS hinges on the court's answer to the above question. Before answering the primary issue, however, the court will deal with some secondary matters that also require attention.

### A. PLAINTIFFS' STANDING

■ The first matter requiring attention is the question of Plaintiffs' standing. As mentioned above, the controlling minority, whose opinion the court must follow, found that the original Plaintiffs had standing to file suit against BISD chal-

lenging its CIS program, and six dissenters concurred on this narrow point. In sum, nine judges held that the original Plaintiffs, all students and parents of students attending public schools in Beaumont, had standing to sue BISD in their respective capacities as students and parents, and also because CIS injured them insofar as it limited the students' "access to the full curriculum offered by the school .…" *Id.* at 467. The judges supporting standing further opined that, at bottom, Plaintiffs' allege they "cannot participate in the school's" main counseling and mentoring program "without taking part in an unconstitutional practice." *Id.* The judges found that the original Plaintiffs' "sought the benefits of a quality program and believed there were no other programs offering comparable mentoring opportunities." *Id.* at n. 13. The lack of sufficiently diverse counseling and mentoring programs "works a deprivation of a student's right not to be excluded from the benefits of a school-financed educational offering—a concrete, judicially cognizable injury." *Id.* at 467. Keeping in mind the opinions of nine Fifth Circuit judges, the court must reevaluate Plaintiffs' standing because standing is a jurisdictional question that must be demonstrated at all stages, including trial. *Id.* at 465; *see also Doe v. Sch. Bd. of Ouachita Parish,* 274 F.3d 289, 292 (5th Cir.2001) (*"Ouachita Parish"*) (citing *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)).

Article III of the United States Constitution grants federal courts jurisdiction over claims between litigants only if such claims present a "case or controversy." *Ouachita Parish,* 274 F.3d at 291. To establish a valid case or controversy, plaintiffs seeking to invoke federal jurisdiction must satisfy three criteria: (1) "they must show they have suffered or are about to suffer an 'injury in fact' "; (2) " 'there must be a causal connection between the injury and the conduct complained of' ";

and (3) " 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' " *Id.* at 291–92 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Regarding the first prong—injury in fact—, the Fifth Circuit reiterated in *Ouachita Parish* its earlier finding in this case: "[t]his court held earlier this year that plaintiffs have standing to assert that their use or enjoyment of a public facility is impaired by an alleged violation of the Establishment Clause." *Id.* at 292 (citing *Beaumont Indep. Sch. Dist.,* 240 F.3d at 466). *Ouachita Parish* also noted that the Supreme Court has acknowledged the right of children and their parents to receive a public education that is compliant with the Establishment Clause. *Id.* (citations omitted). The Fifth Circuit's holdings are directly applicable to at least some of the instant Plaintiffs.

Oxford and his children meet the threshold requirement of showing they suffered an injury in fact as laid out in the Fifth Circuit's opinion in this case and in *Ouachita Parish.* Oxford's children, Brett and Ryan, were third and seventh graders, respectively, in BISD schools during 2000–01, and, thus, they have a personal stake in the outcome of this suit. That Oxford's children did not participate in CIS is not important because children and their parents generally have a right to receive a public education that is coterminous with the Establishment Clause. *Id.* (citations omitted). If the court decides they did not receive a public education that complies with the Constitution, they will have actually suffered a concrete, judicially cognizable injury.

Oxford and his children also satisfy the second and third criteria for standing, which are "causation and redressability." *Id.* at 292 (citing *Allen v. Wright,* 468 U.S.

737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Plaintiffs allege there are no other counseling and mentoring programs like CIS in BISD. They allege that participation in CIS would have caused them to participate in a program that endorses religion in violation of the Establishment Clause. Moreover, Plaintiffs' complaints are redressable by a finding of unconstitutionality in this suit. Before filing suit, Plaintiffs requested that BISD incorporate volunteers other than clergy into CIS.

The court notes that BISD expanded CIS in mid-August 2001 to include a diverse array of counselors under the name "Key Communicators." Def.'s Ex. 34. BISD's transformation of CIS into the "Key Communicators" program shortly before trial, however, does not change the court's ability to rule on the constitutionality of CIS. Put another way, the primary issue of non-neutrality is not moot.

██ It is well settled that Federal courts are not empowered to decide moot questions. *Locke v. Bd. of Pub. Instruction of Palm Beach County,* 499 F.2d 359, 364 (5th Cir.1974) (citations omitted). "[A] suit is moot only when it can be shown that a court cannot even 'theoretically grant' relief." *Benavides v. Housing Authority of City of San Antonio, Tex.,* 238 F.3d 667, 669 (5th Cir.2001) (citation omitted). This rule means that the court should give Plaintiffs the benefit of the doubt as to whether the requested relief would in fact ease or correct the alleged wrong. *Bayou Liberty Assoc., Inc. v. United States Army Corps of Engineers,* 217 F.3d 393, 397 (5th Cir.2000).

Here, BISD has not shown that the court cannot even theoretically grant relief to Plaintiffs. In their first amended complaint, Plaintiffs request, *inter alia,* a declaratory judgment that BISD's CIS program violated the Establishment Clause. Pls.' First Amen. Compl. at unnumbered 5. Although BISD has voluntarily changed

CIS to include non-clergy counselors, nothing prevents it from reverting back to CIS in its former incarnation with clergy only. BISD is not bound by a consent decree or any other settlement agreement with Plaintiffs that would bar further allegedly unconstitutional activity. Moreover, BISD did not implement "Key Communicators" to address the specific complaints of Plaintiffs in this case. Ms. Fischenich testified that CIS became "Key Communicators" when clergy participation in CIS dropped significantly, nearly five years after Plaintiffs first requested the change. If the court finds in favor of Plaintiffs here, the court will declare BISD's implementation of CIS to have been unconstitutional, thereby vindicating Plaintiffs' position. Thus, Oxford and his children have standing to bring suit in this court.

Debra Barry's standing, however, is questionable because Avian is not her biological granddaughter. But it is unnecessary for the court to resolve whether or not she has standing individually or on behalf of Avian because the court concludes that Oxford and his sons have standing to sue.

**B. THE MERITS OF PLAINTIFFS' ESTABLISHMENT CLAUSE CLAIM**

██ The Fifth Circuit, after deciding standing, proceeded to evaluate Plaintiffs' allegations under the three tests used by the Supreme Court in Establishment Clause cases. *Beaumont Indep. Sch. Dist.,* 240 F.3d at 468. The first of these tests is a three prong inquiry that was developed in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which requires a court to determine "(1) whether the purpose of the practice is not secular; (2) whether the program's primary effect advances or inhibits religion; and (3) whether the program fosters an excessive government entanglement

with religion." *Beaumont Indep. Sch. Dist.*, 240 F.3d at 468 (citing *Lemon*, 403 U.S. at 612–13, 91 S.Ct. 2105). The second test is called the "coercion" test which "measures whether the government has directed a formal religious exercise in such a way as to oblige the participation of objectors." *Id.* (citing *Lee v. Weisman*, 505 U.S. 577, 586, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). Finally, the "endorsement" test "prohibits the government from conveying or attempting to convey a message that religion is preferred over non-religion." *Id.* (citing *County of Allegheny v. ACLU*, 492 U.S. 573, 592–93, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). Since the Fifth Circuit applied the "coercion" and "endorsement" tests only to CIS's effects under the second prong of *Lemon*, this court will do the same. *Id.*

### 1. *The First Prong Of Lemon*

The first prong of *Lemon* requires the court to determine whether CIS had a "secular purpose." *Id.* As noted by the Fifth Circuit, "[c]ourts normally defer to a government's statement of secular purpose. That purpose, however, must be sincere and not a sham." *Id.* (citing *Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105). On appeal, the Fifth Circuit found BISD's stated purposes behind implementing the CIS program were secular goals and not pretextual. *Id.* Noting that the record on summary judgment was far from complete, however, the Fifth Circuit ordered this court to determine whether BISD's stated purposes were merely pretextual. *Id.* at 469.

After hearing evidence on this issue from both sides, the court is of the opinion that BISD's stated purposes for the CIS program were not pretextual. BISD's stated goals when creating CIS were to provide (1) meaningful dialogue between the clergy and students regarding civic values and morality; (2) a safe school atmosphere; and (3) volunteer opportunities for additional stakeholders in the schools. Def.'s Ex. 4. In sum, CIS was formulated for the purpose of providing counseling and mentoring to students on various secular subjects. These subjects are highly relevant to the lives of students of all ages, but especially to middle and high school students. Therefore, CIS did not violate the first prong of *Lemon*.

### 2. *The Second Prong Of Lemon, The Coercion Test, And The Endorsement Test*

The second prong of *Lemon* forces the court to examine whether CIS had the primary effect of advancing or inhibiting religion. *Beaumont Indep. Sch. Dist.*, 240 F.3d at 469 (citing *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105). Under this prong, the Fifth Circuit identified two types of impermissible effects for analysis.

#### a. *State–Sponsored Inculcation And The Coercion Test*

The Fifth Circuit analyzed the first type of effect by asking "whether the program . . . cause[d] state-sponsored inculcation of religious beliefs." *Id.* (citing *Agostini v. Felton*, 521 U.S. 203, 223, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)). Also implicated in this inquiry is the "coercion test," which asks whether BISD has "directed a religious activity in such a way as to compel participation." *Id.* (citing *Lee*, 505 U.S. at 586, 112 S.Ct. 2649).

The Fifth Circuit answered both of the above questions in the negative, concluding that CIS did not cause state-sponsored inculcation of religious beliefs because CIS was not " 'pervasively sectarian.' " *Id.* (citation omitted). The controlling minority also found that CIS did not violate the coercion test because counseling on secular topics is not a religious exercise. *Id.* at

470. "If no religious activity is at issue, any speculation as to whether students might feel pressured to participate is irrelevant." *Id.* Plaintiffs point to several instances during CIS sessions where clergy discussed non-secular topics or wore clerical garb, but these instances are isolated and few, although understandably cause for some concern. In addition, no evidence produced at trial showed that CIS obliged students who objected to the program to participate. Students who participated either volunteered or were asked and agreed to participate. Hence, the court finds that CIS neither caused the first type of impermissible effect under the second prong of *Lemon*, nor failed the coercion test enunciated in *Lee v. Weisman.*

### b. *Non–Neutrality And The Endorsement Test*

The second type of impermissible effect enunciated by the Fifth Circuit relates to the neutrality or non-neutrality of CIS. *Beaumont Indep. Sch. Dist.*, 240 F.3d at 470. Benefits given by the government must be allocated among secular and religious organizations in a neutral manner. *Id.* (citations omitted). "A non-neutral program is impermissible because it could convey the message that the religion-oriented recipients are uniquely qualified to carry out those services." *Id.* (citation omitted). The question of neutrality overlaps with the "endorsement test" announced in *Allegheny*, which looks to determine whether the government activity endorses religion by effectively pronouncing that religion is preferred over nonreligion. *Id.* at 470–71; *Allegheny*, 492 U.S. at 593, 109 S.Ct. 3086.

In the Fifth Circuit's opinion, the court deemed this particular case a "symbolism" case, but distinguished it from *Allegheny*, which involved a visual symbol, since the symbolism here was derived from government-sponsored activity. *Beaumont In-*

*dep. Sch. Dist.*, 240 F.3d at 470. The Fifth Circuit agreed with Plaintiffs that the presence of clergy participating in a program named "Clergy in the Schools" carried "some" symbolic weight. *Id.* at 471 ("Even if the clergy do not wear their clerical vestments, the program suggests that they have been chosen as a group because of a perceived expertise in the fields of civic values and morals.").

The Fifth Circuit then set the controlling framework within which this court must evaluate CIS's constitutionality: "[w]e … instruct the district court to consider the entire set of volunteer programs operated by the District—including, but not limited to the 'Clergy in the Schools' program—in answering the question of whether the District preferred religion over nonreligion." *Id.* at 471. Along with this general mandate, the Fifth Circuit specified that, when viewing CIS within the context of BISD's entire menu of volunteer programs, this court should pay particular attention to other programs similar in "mission and means" and determine whether these programs provide services comparable to the "counseling and mentoring" services that were afforded by CIS. *Id.* at 464, 466. "If the set of programs together comprise a mosaic that is neutral with regards to religion, then the Establishment Clause is not offended." *Id.* at 464.

Before the court determines what programs were similar in mission and means to CIS, so that it can then answer the primary question of neutrality, it must first establish the relevant context for making these comparisons. For this context, the court relies on the Fifth Circuit's view of the CIS program. On multiple occasions, including the language quoted in the paragraph directly above, the controlling minority opinion makes clear that it considered CIS as a program that provid-

ed "counseling and mentoring" to students. *Id.* at 466, 467 ("Opportunities for counseling and mentoring services are a needed and valued component of public education."), at 467 n. 13 ("[P]arents sought the benefits of a quality program and believed there were no other programs offering comparable mentoring opportunities."), at 470 ("The key question is in what context we assess that activity—by a narrow examination of each individual extracurricular program, or from the perspective of the District's entire menu of volunteer mentoring and counseling programs."), at 472 ("If the clergy program is fairly viewed, on a fully developed record, as part of a larger framework of secular mentoring and counseling programs, it has not run afoul of the Establishment clause.") ("It is unclear whether the mentoring in other programs is narrow in scope, or whether it reaches to a meaningful degree the broader counseling emphasized in the clergy program.").

Next, the court will endeavor to describe in some detail the CIS counseling and mentoring program, as well as the many other volunteer programs offered by BISD, for the purpose of determining which programs, if any, were similar in mission and means to CIS. As previously mentioned, CIS was one program within the greater "umbrella" organization of the BISD "School Volunteer Program." CIS was instituted by BISD in 1996. It placed clerical volunteers from the Beaumont community in BISD's primary and secondary schools, specifically grades three through twelve, to mentor and counsel students on secular topics. The program was implemented in BISD's nineteen elementary schools, seven middle schools, three high schools, and two alternative schools. Its three main goals were to provide (1) meaningful dialogue between the clergy and students regarding civic values and morality; (2) a safe school atmosphere; and (3) volunteer opportunities for addi-

tional stakeholders in the schools. Def.'s Ex. 4.

The clergy who participated in CIS visited each secondary school at least twice per year and each elementary school at least one time per year. At each CIS session, two to five clergy counseled and mentored twenty-five to thirty-five students on topics such as the school dress code, why rules exist, violence, peer pressure, racial issues, stereotyping, jealousy, unity, self-esteem, self-discipline, setting goals, diversity, single-parent family, gossip, harassment, alcohol, drugs, and respect. Def.'s Ex. 4. An administrative employee of BISD was required to attend each CIS session. BISD's annual reports on volunteer programs for 1997–98, 1998–99, and 1999–2000 contain the following description of CIS: "[a]rea clergy volunteers act as role models and 'listeners' for youth. Ministers meet as a group once a month with students and have dialogue that focuses on goal setting and staying drug free." Def.'s Ex. 23, 52, 53.

During the years that BISD operated CIS, many clergy from the Beaumont area volunteered to participate in the program: (1) 154 in the 1996–97 school year; (2) 186 in the 1997–98 school year; (3) 197 in the 1998–99 school year; and (4) 55 in the 1999–2000 school year. Dft's Ex. 51, 52, 53, 23. Joy James, Coordinator of School Volunteers and School Business Partnerships for BISD, provided the court with these numbers in her trial testimony. The numbers are useful to the court for comparison to the number of volunteers who participated in other volunteer programs with missions similar to CIS, if any.

Participation in CIS was voluntary for students, but there is conflicting evidence regarding whether parental consent was required for all students throughout the entirety of the program. The Fifth Circuit encountered this issue as well. *Beaumont*

*Indep. Sch. Dist.*, 240 F.3d at 465. At trial, Dr. Thomas testified that parental consent was required by each school during the five years of CIS's existence. Additionally, Priscilla Rouse testified that parental permission forms were required and used at her school. Plaintiffs, however, dispute this testimony. They contend that parental consent was not always required. To this end, Plaintiffs point to a memo from Hebert, dated October 15, 1998, addressed to seven participating BISD schools, wherein Hebert instructed the schools to select thirty students to meet with clergy for forthcoming CIS sessions. Pls.' Ex. 46. She set forth the types of students BISD counselors were to recruit for CIS sessions, such as students that excel, regular students, high risk students, and invisible students, but said nothing about requiring parental consent. High risk students were described as those with attendance problems and failing grades, while invisible students are those who are quiet and tend not to participate in school activities. *Id.* Plaintiffs also offer a nearly identical memo from Hebert, dated October 14, 1999, which contains the following phrase in boldface type in addition to the aforementioned instructions: "[a]ll students must have a parent permission slip to participate in the Clergy In Schools Program." Pls.' Ex. 16. Hebert's bold typed face addition is instructive, and certainly could mean that not every BISD school actually required parental consent for CIS in the 1998–99 school year, but the differing memoranda alone do not establish that BISD did not require students to get parental consent to participate in the CIS program. Based upon the testimony of Dr. Thomas and Ms. Rouse, the court is of the opinion that BISD's policy was to require parental permission, although it is impossible to determine whether this was actually done for every student who participated in CIS.

The Fifth Circuit observed that the record, as developed on appeal, was unclear as to the number of students who participated in CIS during its years of operation. *Beaumont Indep. Sch. Dist.*, 240 F.3d at 465. However, despite having the benefit of the Fifth Circuit's opinion, and knowing of the Fifth Circuit's interest in learning the precise number of participating students, BISD was unable to produce any such evidence at trial. When asked by the court, none of BISD's witnesses knew the exact number of student participants in CIS each year or in total. The witnesses also indicated that they could not produce that information.[4]

Before Plaintiffs brought this suit, they asked BISD to integrate CIS by adding lay counselors and mentors, but BISD declined Plaintiffs' request. Given the apparent ease with which BISD could have remedied Plaintiffs' objection while also eliminating any potential Establishment Clause worries, the Fifth Circuit mandated this court, on remand, to settle "the reasons for the District's rejection" of Plaintiffs' initial suggestion. *Id.* at 472. After considering the trial testimony of Dr. Thomas, Rev. Walker, and Dr. Fuller, the court believes BISD decided against inte-

---

4. Marilyn Hebert suggested that the court could estimate the number of student participants by assuming 25–30 students in each CIS session multiplied by the number of BISD schools and again multiplied by the number of times per year that CIS sessions were held in each school. Therefore, using the lower estimate of 25 students per session once a year in each of the 19 elementary schools would result in 475 participants each year. With respect to the secondary schools, including seven middle, two alternative and three high schools wherein CIS sessions were held twice each year with 25 students per session, the total number of secondary school students participating in CIS would be 600. The total for all BISD schools would come to 1,075 student participants per year.

grating CIS with non-clergy counselors and mentors because some members of the clergy who volunteered in CIS felt it would somehow weaken the program or diminish the influence and stature of the clergy if non-clergy were included.

The court will now examine the other volunteer programs offered by BISD to determine "whether these opportunities provide services to the students that are comparable to the counseling and mentoring featured in the clergy program," that is, whether other programs are similar in mission to CIS. *Id.* at 466. The court must also compare each program's method or means to the structure and coverage of CIS. When looking at these programs, the court will consider only those programs that operated during the pendency of CIS, which was 1996–2001. *See* Def.'s Ex. 23, 51, 52, 53 (enumerating the program components of BISD's larger "School Volunteer Program").

At the outset, the court observes that only one extracurricular volunteer program arguably exhibits a mission of counseling and mentoring students on a broad range of topics similar to CIS—the "Special Friends" program. The remaining programs are either academic assistance programs, programs focusing on crime or drug use, or programs involving speakers on topics such as career awareness. Moreover, the means of most programs, including "Special Friends," vastly differ from the means employed by the CIS program.

(1) In the "D.A.R.E." program, local police officers and sheriff deputies lecture fourth, fifth, and seventh grade students on the harm caused by using drugs, alcohol and tobacco. "D.A.R.E." is not a counseling and mentoring program. The officers and deputies who participate lecture students on a narrow range of topics. Also, the means used by "D.A.R.E." are different than CIS's because "D.A.R.E.'s"

reach is limited to three primary school grades.

(2) The "C.H.I.C.K.E.N. Club" is a program about the dangers of drugs for fourth and fifth graders exclusively. The program consists of an antidrug rally, a poster contest, and an essay contest, not counseling and mentoring.

(3) "Crossing the Line" is a program offered by local attorneys for sixth, seventh, and eighth graders that covers subjects like crime, drugs, alcohol, tobacco, and civic responsibilities. Volunteers in "Crossing the Line" present a set curriculum developed by the Texas Young Lawyers Association. The program does not involve group counseling and mentoring on a broad range of topics like CIS.

(4) "Parent/Community Volunteers" provides volunteers who serve on the playground and assist in the library, media center, health center, a computer lab, and chaperone for events and field trips. None of the above activities allow volunteers to serve as counselors or mentors. The volunteers' roles are merely supervisory or academically oriented.

(5) "School/Business Partnership" is a program that involves over 70 local businesses and pairs one business with one BISD school. "The basis of the program is release time for employees to volunteer one hour/one day a week in their partner school." Def.'s Ex. 23. Business volunteers tutor students and act as "Special Friends" in grades K–8. The tutoring portion of this program does not involve mentoring or counseling students. Its mission is to assist students with specific academic problem areas. To the extent the "School/Business Partnership" program overlaps with "Special Friends," the court will analyze it with "Special Friends" below.

(6) The "T.A.A.S. Essay Readers" program utilizes volunteers to score practice essays for high school students once every six weeks. This program is limited to BISD's three high school campuses and its purpose is to "raise writing scores on the state-mandated TAAS test." *Id.* The "T.A.A.S. Essay Readers" program is not similar to CIS in mission or means as it is not a counseling and mentoring program, and it serves only ninth through twelfth grade students.

(7) "Retired and Senior Volunteer Program ("R.S.V.P.")" is a national volunteer agency that places senior citizen volunteers at designated sites and allows them to choose assignments to suit their interests. BISD permits "R.S.V.P." volunteers to tutor students, make presentations, score T.A.A.S. essays, and assist in a school library, among other services. *Id.* "R.S.V.P." differs in mission from CIS because it does not provide counseling and mentoring services for students. The "R.S.V.P." services listed in BISD's annual report on volunteer programs involve either making presentations or affording academic assistance and, unlike CIS, do not involve discussion of the nonacademic, secular topics associated with CIS.

(8) "Jefferson County Medical Auxiliary 'Child Lures'" in its former incarnation was "Kids on the Block," a puppet show program taught by the Beaumont Junior League, which dealt with issues like diversity, illness, and sensitivity to others. "Kids on the Block" was replaced after 1994 by "Child Lures," an information-based program for second graders about personal safety, which is taught by the Jefferson County Medical Auxiliary. "Child Lures" is hardly comparable to CIS in mission and means. It provides information without offering mentoring or counseling and is only offered to second grade students.

(9) The "ExxonMobil Green Team" is based upon a grant given by the Exxon-Mobil Foundation to employ high school seniors. "The grant's goal is to give seniors real work experience." Def.'s Ex. 23. This program is nothing like CIS because, although it may result in work-based mentoring relationships, it offers no counseling on topics similar to those addressed by CIS. Further, "ExxonMobil Green Team" is available solely to high school seniors to the exclusion of other primary and secondary students.

(10) The "Resource/Enrichment Volunteers" are speakers who share "their technical expertise or their special knowledge with students in every school in BISD. Presentations are arranged by teacher request." *Id.* Speakers and presentations do not constitute counseling and mentoring services. CIS volunteers acted as "role models" and "listeners" who counseled students on a broad range of topics, whereas "Resource/Enrichment Volunteers" ostensibly are confined to their area of vocational expertise or special knowledge.

(11) Finally, the court must analyze the "Special Friends" program and then compare it to CIS in both mission and means. BISD states that "[t]he purpose of the 'Special Friends' program is to allow a kindergarten through eighth grade student the opportunity to discuss problems with an impartial, caring adult." *Id.* "Special Friends" provides one-on-one counseling through "active listening" on subjects that could include drugs, race, and violence. Students who are selected to participate are those perceived by BISD to have some sort of academic or attendance problem. Parental consent is required before students are authorized to participate. Sessions take place once per week on campus, during school hours. Anyone can volunteer to be a "Special Friend," including non-clergy professionals. According to the

testimony of Joy James, however, the number of volunteers who act as special friends is extremely small. She estimated that twenty-five to thirty volunteers participate in the "Special Friends" program per year.

In comparing CIS to "Special Friends," the court finds that the programs have similar, although not identical, missions, but the size and coverage of the programs differ. Regarding each program's mission, CIS was a counseling and mentoring program designed to create a dialogue between clergy volunteers and students, addressing a broad range of topics that are of concern to students. Similarly, "Special Friends" is a program that encourages students to discuss their problems with an adult who acts as an informal counselor.

Regarding each program's method or means, the coverage of "Special Friends" is entirely different than that of CIS. CIS involved group discussions with students from grades three through twelve, whereas "Special Friends" involves one-on-one discussions with students from kindergarten to eighth grade only, excluding high school students altogether. Moreover, "Special Friends" has a total of twenty-five to thirty volunteers each year, a number far lower than the number of clergy who volunteered in CIS from, at least, 1996–2000. As mentioned above, there were 154 clergy volunteers in the 1996–97 school year, 186 in 1997–98, 197 in 1998–99, and 55 in 1999–2000. Further, "Special Friends" targeted students with discernable problems, as opposed to CIS, which took volunteers and asked a variety of students to participate. Therefore, if a BISD student was a ninth, tenth, eleventh, or twelfth grader, no counseling and mentoring opportunities were available to that student, except CIS, from 1996–2001.

Even if a student was not in high school during the active operation of CIS, no counseling programs were available for that student, aside from CIS, unless a BISD employee expressly chose him or her to participate in the "Special Friends" program and assigned that student a special friend. In addition, the likelihood a third through eighth grader would have been selected to participate in the "Special Friends" program was relatively low because "Special Friends" only used at total of twenty-five to thirty volunteers to cover nineteen elementary schools and seven middle schools.[5] In short, the great majority of students in grades three through eight, as well as all students in grades nine through twelve, simply could not have received any counseling and mentoring from non-clergy volunteers for five full school years at BISD.

Accordingly, the court concludes that, at the time CIS was implemented, BISD's volunteer programs did not "comprise a mosaic that is neutral with regards to religion." *Beaumont Indep. Sch. Dist.*, 240 F.3d at 464. Following the Fifth Circuit's instructions to assess CIS among the entire menu of BISD volunteer programs, the court could only find one program even arguably comparable to CIS in mission, but that program, "Special Friends," is too small in scope to overcome the requirement of neutrality under the second half of the second prong of *Lemon*. When CIS was in existence, very few students had any opportunity to receive non-clergy counseling and mentoring on topics similar to those discussed during CIS sessions in a give-and-take format. Moreover, non-clergy volunteers did not have an equal chance to counsel and mentor students on topics and in ways similar to CIS volunteers.

---

5. Hebert testified at trial that the total enrollment in BISD's middle schools was 4,600 students in September of 2001 out of a total enrollment in all BISD schools of 20,895 students at that time.

Apart from "Special Friends" and CIS, BISD's programs were basically academic programs, work programs, or presentations to students, which differed from CIS in both mission and means.

The Fifth Circuit opined that BISD "owes a duty to be evenhanded in its policies toward religion and non-religion, a duty of equality." *Id.* at 473. However, considering CIS in its proper context, it appears that BISD was not evenhanded regarding religion. The only program that covered students like CIS was CIS, which involved only clergy. No other program dealt with similar issues through counseling and mentoring. Considering its entire volunteer program, BISD's policy regarding counseling and mentoring was non-neutral and impermissibly favored religion. The whole BISD volunteer program conveyed the message that clergy are "uniquely qualified" to carry out counseling and mentoring on the broad range of secular topics covered by CIS. *Id.* at 470. Thus, BISD's CIS program failed both the second prong of the *Lemon* test and the endorsement test because it conveyed the message that religion is preferred over non-religion. *Id.* (citing *Allegheny,* 492 U.S. at 593, 109 S.Ct. 3086).[6]

### 3. *The Third Prong Of Lemon*

The third prong of the *Lemon* test proscribes excessive entanglement. *Id.* at 471–72 (citing *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105). "Only programs that require 'pervasive monitoring' run afoul of the Establishment Clause. The Court has held that to require from religious officials the performance of administrative duties

consistent with and not more onerous than those required from non-religious officials in analogous programs does not constitute excessive entanglement." *Id.* at 471–72 (citing *Agostini,* 521 U.S. at 232–34, 117 S.Ct. 1997; *Roemer,* 426 U.S. at 764, 96 S.Ct. 2337).

When discussing this issue, the Fifth Circuit found no excessive entanglement because CIS did not require BISD administrators to undertake any uncommon measures when monitoring the program. *Id.* at 472. This court also finds that CIS did not cause excessive entanglement between BISD and religion. It has always been BISD's policy to have school administrators monitor its volunteer programs, including CIS. Multiple BISD administrators, such as Dr. Thomas, Marilyn Hebert, and Beth Fischenich, testified that they spent no more time overseeing CIS than other programs. The court believes that any entanglement was caused, in large part, by this lawsuit. As a result, CIS did not require "pervasive monitoring" in violation of the Establishment Clause.

### III. CONCLUSION

After hearing the testimony, arguments, and evidence adduced at trial, and after considering the parties' exhibits and post-trial briefs, the court concludes that BISD's CIS program violated the Establishment Clause of the First Amendment to the United States Constitution. CIS failed the second prong of the test pronounced in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), as well as the endorsement test from

---

**6.** Although this court has concluded that BISD impermissibly favored religion in this instance, BISD should be commended for developing programs that reach out and are available to students who could benefit from counseling and mentoring. As the Fifth Circuit states, "[o]pportunities for counseling and mentoring services are a needed and val-

ued component of public education." *Beaumont Indep. Sch. Dist.,* 240 F.3d at 467. This is especially true for students whose parents have failed to set a good example as role models or who are, in some cases, altogether absent from the lives of their children. However, this type of programming must be neutral with respect to religion.

County of Allegheny v. ACLU, 492 U.S. 573, 592–93, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In response to the Fifth Circuit's articulation of the primary issue in this case, the court is of the opinion that BISD impermissibly preferred religion over non-religion because the CIS program was not neutral with respect to and, in fact, endorsed religion.

Viewing CIS in the context of BISD's aggregate volunteer program from 1996–2001 demonstrates that the counseling and mentoring provided in programs other than CIS, excluding "Special Friends," was narrow in scope and did not reach the broader counseling emphasized in CIS, which was comprised solely of clergy. Even "Special Friends," which is arguably similar in mission, is utterly dissimilar in means. "Special Friends" provides a much smaller group of volunteers than CIS and fails to cover the counseling needs of many elementary and middle school students, as well as all BISD high school students.

Therefore, the court GRANTS Plaintiffs' request for declaratory judgment against BISD because the CIS program, at the time it was implemented, and in the context of its implementation, violated both the Lemon test and the endorsement test. BISD had no comparable programs in both mission and means to offset CIS's non-neutrality toward and endorsement of religion. It is so ORDERED.