# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 29, 2022

Lyle W. Cayce
Clerk

No. 21-20279

Freedom From Religion Foundation, Inc.; John Roe,

*Plaintiffs—Appellees*,

*versus*

Wayne Mack, *in his individual capacity*,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:19-CV-1934

Before Jolly, Smith, and Engelhardt, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Just before the Founding, the Virginia General Assembly considered supporting clergy with a new tax. The tax would have been tiny. But James Madison fiercely objected. He observed, "[An] authority which can force a citizen to contribute three pence only . . . for the support of any [religious] establishment[ ] may force him to conform to any other establishment."

The bill failed—and Madison may have been right. But three pence is measurable coercion. This is a zero-pence case.

No. 21-20279

The plaintiffs cry coercion because Texas Justice of the Peace Wayne Mack opens his court with a ceremony that includes a prayer. But Mack also takes great pains to convince attendees that they need not watch the ceremony—and that doing so will not affect their cases. Some attendees say they feel subjective pressure anyway. Yet the plaintiffs have no evidence suggesting that "coercion is a real and substantial likelihood." *Town of Greece v. Galloway*, 572 U.S. 565, 590 (2014).

Want of evidence showing coercion dooms their case. In holding otherwise, the district court disregarded the Supreme Court's most recent guidance. So we reverse and render judgment for Mack.[1]

I.

Because this appeal follows cross-motions for summary judgment, we recount the relevant evidence from both sides.

A.

The jurisdiction of Mack's court includes criminal offenses that are punishable by fines and civil controversies of $20,000 or less. TEX. GOV'T CODE § 27.031 (2020).[2] His court, like all Texas justice courts, is a high-volume, non-record court; it produces judgments unsupported by written opinions. *See* TEX. R. CIV. P. 505.1(c). Its judgments are reviewed *de novo*

---

[1] Madison voiced the above-referenced objection in his famous Memorial and Remonstrance Against Religious Assessments. Letter from James Madison to the Virginia General Assembly (undated), *in* 2 THE WRITINGS OF JAMES MADISON 183, 186 (Gaillard Hunt ed., 1901). Patrick Henry spearheaded the bill, which called for "establishing a provision for teachers of the [C]hristian religion." H. J. ECKENRODE, SEPARATION OF CHURCH AND STATE IN VIRGINIA 74, 99 (1910). Madison led the opposition. *Id.* at 85–86. In part because of Madison's eloquent condemnation, the bill "quietly died in committee without being brought before the [Assembly]." *Id.* at 106, 113.

[2] His jurisdiction over civil controversies has other exceptions. *Id.* § 27.031(b).

No. 21-20279

by the Montgomery County courts.  Tex. R. Civ. P. 506.3.

Before Mack was elected a Justice of the Peace, he was a Pentecostal minister for ten years.  He also worked for Montgomery County, including as a volunteer coroner.  As a coroner, Mack witnessed a young woman's death from a tragic accident.  Her family tried and failed to get a chaplain to the scene in time to perform religious rites.

Mack resolved to improve access to chaplaincy services in Montgomery County.  When he ran for the justiceship, he campaigned on creating a chaplaincy program.  He also promised to open his courts with prayer.  When he was elected, he implemented both policies.

Mack created what he calls the Justice Court Chaplaincy Program ("JCC Program").  Faith leaders may participate in the JCC Program in one of two ways.  *First*, they can agree to be "on call" to respond to sudden tragedies.  When "on call," a chaplain should assist anyone who asks for help.  *Second*, a chaplain may volunteer to assist only members of his own faith who ask for help.

Mack permits JCC Program chaplains to pray in his court's opening ceremony.  He says he does that to honor and thank JCC Program members for their service.  He explains that his staff invites JCC Program members to sign up to pray on a court day.  In other words, the constituency of the JCC Program affects the nature of the prayers delivered in Mack's court.  So although this dispute is about the prayers—not the JCC Program—the program's nature is relevant to the prayers' legality.

Mack has described the JCC Program in overtly religious terms.  For example, he once said a volunteer chaplain's role was to "be a representative of God bearing witness to His hope, forgiving and redeeming power."  But he says his objective is to ensure that when local families request help with sudden tragedies, the JCC Program has a representative from "every mosque,

every temple, every synagogue, every church you can imagine" to respond.

Mack claims he has "actively sought diverse participation" in the JCC Program. He says his chaplains include "clergy and lay persons [comprising] Protestantism, Catholicism, Buddhism, Hinduism, Judaism, and Islam." He recounts personally recruiting clergy from Judaism, the Church of Jesus Christ of Latter-day Saints, and Jehovah's Witnesses to join the program.

The plaintiffs claim the JCC Program is predominantly Protestant. They say all the non-Protestant program members have chosen the second way to participate. That is, those chaplains do not sign up to be generally "on call" but, instead, participate "only in the event that a member of their faith community seeks a chaplain." Accordingly, they get fewer emails from Mack, which may make them less likely to be invited to pray. The plaintiffs aver that Mack's current prayer-invitation list includes "all or nearly all of the Christian chaplains" in the JCC Program, "four Islamic chaplains," but no chaplains from "Catholicism, Buddhism, Hinduism, [the Latter-day Saints, or] Judaism."

That brings us to the prayer ceremony. Though the record contains evidence about previous iterations of Mack's ceremony, we focus on his present ceremony because the plaintiffs seek only prospective relief.

When a visitor arrives at Mack's court, he sees a message inscribed on the door and on a nearby television screen: "It is the tradition of this court to have a brief opening ceremony that includes a brief invocation by one of our volunteer chaplains . . . . You are not required to be present or participate. The bailiff will notify the lobby when court is in session." If the visitor arrives before court has opened, the door will be open and monitored by a bailiff. As he walks into the room, a litigant must check in with the court clerk.

The courtroom door may be closed after the court's opening time. A bailiff introduces the court's opening ceremony. So if only one bailiff is work-

No. 21-20279

ing, there is no one to watch the door during his explanation. On such days, the door is magnetically locked while the bailiff speaks. It cannot be opened from the outside. It can be opened from the inside by pressing a small, green button, which visitors often overlook. So visitors often draw attention to themselves when they wish to leave because a member of the court staff must help them find the button. But according to Mack, the court has been able to hire more bailiffs recently, which means the courtroom door is "never closed" during the opening ceremony.

> The bailiff reads from a script. He tells the audience,
>
> [I]t is the tradition of the U.S. Supreme Court, Texas Supreme Court[,] and this Justice Court to have a brief opening ceremony that includes [an] invocation by one of our volunteer chaplains . . . . You are NOT required to be present during the opening ceremonies, and if you like, you may step out of the [courtroom] before the Judge comes in. Your participation will have no effect on your business . . . or the decisions of this court.
>
> So . . . before court begins[,] please take this opportunity to use the facilities, make a phone call, or not to participate in the opening ceremonies. You may exit the [courtroom] at this time.

The bailiff promises to "notify the lobby when court will be called into session." The script reminds the bailiff that the "door must be open during the prayer."

Mack enters the courtroom shortly after the bailiff's announcement. Attendees sometimes leave the courtroom between the bailiff's announcement and Mack's entrance. One court employee has explained that she does not know whether someone is leaving because he objects to the prayer or for another reason.

When Mack enters the courtroom, he greets the audience and begins the prayer ceremony. He introduces the chaplain and thanks him for his ser-

5

vice in the JCC Program. Then he permits the chaplain to speak. Mack tells the chaplains that their remarks must be "brief" but otherwise gives no instructions. Nearly all the chaplains pray. But a few just give "encouraging words" and thank Mack for including them in the JCC Program.

The parties dispute what Mack does during the prayers. Mack insists that he always faces the flags behind his chair so he can't see the audience while the chaplain speaks. The plaintiffs say—based on four firsthand accounts—that Mack not only faces the audience but also keeps his eyes open and scans the audience as if probing attendees' piety.

The chaplains' remarks vary, even among those who choose to pray. Some prayers are short and ecumenical—for instance, "May the Lord bless you." But some observers claim to have witnessed prayers they characterize as "five- to eight-minute [Christian] sermon[s]." Observers also describe at least some prayers as "highly religious," "addressed to the Christian God," and as made in Jesus' name. They say some prayers are worded to include the audience in supplication. For example, prayers may include the phrase, "*we* come to you today to ask that you help *us*." (Emphasis added.)

Mack says long prayers are rare. And he insists that no chaplain has ever proselyted or denigrated another faith or nonfaith. He has no formal policy against proselyting but says it would be "considered very inappropriate" and inconsistent with the JCC Program's purpose and values. Chaplains, he says, know they must not "promote their individual faith[s]."

The bailiff directs the able audience members to stand and bow their heads during the prayer. Mack says that's because he hopes the prayers will "set[ ] a tone . . . [f]or everybody that's in the courtroom." That tone, he thinks, is that the "rule of law will be applied and respected and that people are in a place where they can seek justice."

After the opening ceremony, a bailiff announces to anyone in the lobby

that court is about to start.  If there is only one bailiff on duty, the door will again be closed and locked.  Because there is no way to open the door from the outside, anyone wishing to enter the courtroom in such circumstances can do so only by attracting the attention of someone inside the room.  Doing that may highlight the visitor's absence from the opening ceremony.

The plaintiffs also suggest that Mack has another way of learning which litigants didn't attend the ceremony.  If a litigant enters the courtroom for the first time after the ceremony, he will not have checked in, so the clerk may have placed his files in a separate pile of cases to be called last.  That later call could distinguish those litigants.  Mack also might consult the clerk's check-in list to see who arrived last.  But Mack says he's never done that.

That concludes the general evidence concerning Mack's prayer ceremonies.  Enter the plaintiffs.

The pseudonymous individual plaintiff, Roe, is a lawyer who practices in Montgomery County.  He litigates mostly landlord-tenant and debt-collection cases.  That work used to bring him frequently to Mack's court; he has appeared there about ten times to litigate about twenty cases.

Roe is "religiously unaffiliated and objects to a government official telling him when or how to pray."  So Mack's prayer ceremonies "violate[ ] his sincerely held beliefs."  But when he attended Mack's court, he "felt compelled to remain in the courtroom during the prayers."

Once, though, Roe was not in the gallery at the beginning of the ceremony.  He says the court's clerk found him and told him he "needed" to participate in the ceremony.  (Alteration adopted.)  Roe complied to avoid "bias[ing]" Mack against his clients.  But he admits he was "technically in the courtroom" when the clerk spoke to him; he was negotiating with an opponent in a jury room.  So Roe hadn't followed the instructions to "step out" of the courtroom and wait in the "lobby" if he didn't wish to witness

the prayer.  He otherwise has never tried to leave the courtroom before the prayer.

Roe thinks it would be "crazy to leave" Mack's courtroom before the ceremony.  He says his clients don't want him to "make a scene [or] be an activist."  They want effective representation, which Roe thinks requires participation because the prayer ceremony is "baked into every aspect" of Mack's court.  He infers that the ceremony is very important to Mack and that not participating risks Mack's ire.  But Roe admits that he can't identify specific instances of bias against him, his clients, or anyone else.

Roe now refuses to practice in Mack's court.  So he has "stopped taking . . . cases [in Montgomery County] because of Judge Mack."  He thinks the business he refused would have been worth "a couple hundred" or a "thousand" dollars.  Roe would resume practicing before Mack if Mack discontinued the prayers.

The institutional plaintiff is the Freedom From Religion Foundation.  The Foundation describes itself as a "non-profit membership organization that advocates for the separation of church and state and educates the public [about] nontheism."  It brings this suit only on Roe's behalf.  Roe has continuously been a Foundation member for just over three years.

Although the Foundation sues on Roe's behalf, it has collected testimony from other members who have interacted with Mack's court.  Two of those affiants claim they suffered bias.

One affiant, a lawyer, says he appeared *pro se* in Mack's court to try to evict a tenant.  During the prayer, he didn't bow his head "as the others in the courtroom did."  He claims Mack was watching the audience and noticed his reluctance.  Then, when he presented his case, he thought Mack "acted unprofessional and hostile."  He avers that Mack "left the courtroom twice, without explanation" during his trial.  The governing law, he says, was

"unambiguously clear," yet Mack gave him only the "bare minimum relief to which [he] was entitled." He "believe[s] this was due to [his] nonparticipation in [the] courtroom-prayer practice."

Another affiant appeared before Mack as a criminal defendant. She says her lawyer had already negotiated a plea agreement that directed her to pay a fine. But during the prayer ceremony, she showed "apathy," which she thinks Mack noticed. When Mack reviewed the deal, he said he had a "problem" with it and tried to increase the fine. Later, he agreed to the original amount. The affiant has "very little doubt" that Mack tried to increase the fine because of her unenthusiastic participation. Mack claims he "had no prior knowledge of [her] participation or lack thereof in the opening ceremonies."

## B.

The plaintiffs sued Mack both as an official and as an individual. Only the individual-capacity claim is before this court. On that claim, the plaintiffs sought only declaratory and injunctive relief.[3]

The district court granted summary judgment for the plaintiffs. It was unpersuaded that Mack's prayer ceremony is grounded in historical practice. It concluded that Mack's practice is impermissibly coercive because "attendees in [Mack's] courtroom are, in essence, a captive audience." And it reasoned, under the test from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), that Mack's ceremonies have a nonsecular purpose and advance and endorse religion. So it declared that Mack's "practice of opening regular court

---

[3] Under 42 U.S.C. § 1983, an injunction cannot issue against a "judicial officer" in his "judicial capacity . . . unless a declaratory decree was violated or declaratory relief was unavailable." Accordingly, the plaintiffs have asked for an injunction as an alternative to declaratory relief.

proceedings with religious prayers is unconstitutional."

Mack asked this court to stay the judgment pending appeal, and we agreed. *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 317 (5th Cir. 2021). We reasoned that Mack was likely to defeat the plaintiffs' individual-capacity claim after we concluded that historical evidence grounds Mack's ceremonies in tradition and that his ceremonies are less coercive than other forms of public prayer that are constitutional. *Id.* at 313–15. We now vindicate that conclusion.[4]

## II.

But first, we must decide whether we have jurisdiction to resolve this dispute. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Jurisdiction exists if the plaintiffs had standing to challenge Mack's prayer practice. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). Though the issue was litigated before the district court, Mack does not now contest the plaintiffs' standing. No matter. We are obliged to ensure that we have subject-matter jurisdiction, "sua sponte if necessary." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 468 (5th Cir. 2020) (en banc) (quo-

---

[4] The motions panel also stayed the district court's orders regarding the plaintiffs' official-capacity claim. *Freedom From Religion Found.*, 4 F.4th at 311–13. In doing so, it held that "the only way to bring an official-capacity claim against an officer of the State is to do so under the equitable cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908)." *Id.* at 311. That is, it held that Section 1983 does not provide a cause of action for official-capacity suits.

But the plaintiffs' official-capacity claim was not properly before this court because Mack did not appeal any orders related to that claim. So our § 1983 holding was outside our jurisdiction and unnecessary to resolve this case. Accordingly, we VACATE that holding and leave that question open for later consideration. *See Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017) (per curiam) (explaining that motions panels address "only the issues necessary to rule on the motion to stay pending appeal" and that their "determinations are for that purpose and do not bind the merits panel"); *see also Robinson v. Ardoin*, 37 F.4th 208, 232 (5th Cir.) (per curiam) (same), *cert. granted*, 142 S. Ct. 2892 (2022).

tation omitted).

The Foundation sues only on Roe's behalf. When an entity sues to redress its members' grievances, Article III requires that "its members would otherwise have standing to sue in their own right," and "the interests it seeks to protect are germane to the organization's purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quotation omitted). Protecting Roe against putative Establishment Clause injury is germane to the Foundation's purpose of "advocat[ing] for the separation of church and state." So both parties' standing depends on whether Roe is suffering a constitutionally cognizable injury-in-fact. *See Lujan*, 504 U.S. at 560.

Putative injuries caused by public religious exercise "represent the outer limits" of what is constitutionally cognizable. *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017). Some say our caselaw has pushed beyond those limits. *See, e.g.*, *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2098–2103 (2019) (Gorsuch, J., concurring in the judgment). Undeniably, the law of Establishment Clause standing is hard to reconcile with the general principle that standing is absent where a plaintiff has only a "generalized grievance shared in substantially equal measure by all or most citizens."[5] Indeed, the Establishment Clause has repeatedly gotten special treatment when it comes to standing.[6] That treatment may have been unwarranted.

But correct or not, our precedents bind us. Without an unequivocal, "intervening change in the law," we must apply the rules established by our prior decisions. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th

---

[5] *O'Hair v. White*, 675 F.2d 680, 687 (5th Cir. 1982) (en banc) (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974)).

[6] *Compare, e.g.*, *Frothingham v. Mellon*, 262 U.S. 447, 487–89 (1923), *with Flast v. Cohen*, 392 U.S. 83, 104–06 (1968).

Cir. 2021) (quotation omitted).

For a plaintiff to sue under the Establishment Clause, his "regular activities" must prompt "personal confrontation" with the challenged religious exercise. *Barber*, 860 F.3d at 354. When a plaintiff seeks only prospective relief, he must show that future confrontation is substantially likely. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375–76 (5th Cir. 2021). If a plaintiff's confrontations cease, his claim may be moot. *Staley v. Harris Cnty.*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc).

Roe has established an ongoing confrontation with Mack's prayer ceremony. Although his decision not to appear before Mack means that he no longer hears the prayers, Mack's policy continues to affect his behavior. Roe says he regularly is asked to take cases in Mack's court, and he always declines. That decision is itself a confrontation with Mack's ceremony. Whether a plaintiff chooses to endure or avoid the psychological harm he complains of, he feels its effects.

So Roe's injury is cognizable under our caselaw. Roe and the Foundation have standing to challenge Mack's ceremonies. On to the merits.

## III.

When we review the disposition of cross-motions for summary judgment, we treat those motions "independently." *Express Oil Change, LLC v. Miss. Bd. of Licensure*, 916 F.3d 483, 487 (5th Cir. 2019). Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). For each motion, we look at the evidence and draw the reasonable inferences "most favorable to the nonmoving party." *Express Oil Change*, 916 F.3d at 487.

We begin with Mack's motion. A fact dispute's materiality depends on substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

So Mack can show there's no material dispute if he demonstrates that the plaintiffs could not prevail even if each factual question were resolved in their favor. *See Poole v. City of Shreveport*, 13 F.4th 420, 423 (5th Cir. 2021).

We confront that question in the wake of *Galloway*, in which the Court held that a town did not violate the Establishment Clause by opening its board meetings with sectarian Christian prayers. *Galloway*, 572 U.S. at 571–72. And the Court reaffirmed that legislative prayer "has long been understood as compatible with the Establishment Clause." *Id.* at 575 (citing *Marsh v. Chambers*, 463 U.S. 783 (1983)). Accordingly, if we are to hold that Mack's prayer practice violates the Establishment Clause, we must distinguish it from the practice at issue in *Galloway*.

The plaintiffs offer four ways to distinguish *Galloway*. *First*, they say Mack cannot show that courtroom prayer is supported by an "unambiguous and unbroken history of more than 200 years" that has "continued virtually uninterrupted since the Founding." (Quotation omitted.) *Second*, they claim Mack's prayers have more sectarian content. *Third*, they assert that Mack has failed to maintain a policy of denominational nondiscrimination. *Fourth*, they contend that Mack's prayer practice is more coercive. We address each possibility in turn.

## A.

To evaluate the historical evidence, we must first identify the legal standard. The plaintiffs point to *Chambers*, 463 U.S. at 792, in which the Court observed that legislative prayer was supported by "unambiguous and unbroken history of more than 200 years." But offering that language as a legal standard confuses a sufficient condition for a necessary one.

It is now well established that public, government-sponsored prayer has long enjoyed a place in American life. *Galloway*, 572 U.S. at 575. Still, the prayer ceremony in *Galloway* was slightly different from the prayers per-

mitted by *Chambers*. For one thing, the town-board meetings in *Galloway* had elements of both legislative and adjudicative proceedings. *Id.* at 626 (Kagan, J., dissenting). For another, the prayers were often sectarian. *Id.* at 577. Yet the Court did not ask anew whether sectarian prayer before hybrid legislative-adjudicative proceedings was independently supported by two hundred years of unambiguous, unbroken history.

Instead, the Court asked whether the town's prayer practice "fit[ ] within," *ibid.*, or was "consistent with the tradition of legislative prayer," *id.* at 578. Accordingly, the Court identified only three historical instances of sectarian prayer before concluding that the standard for consistency was satisfied. *See id.* at 578–79.

We follow the Court's lead. So we ask whether courtroom prayer is consistent with a broader tradition of public, government-sponsored prayer. *See Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 527 (5th Cir. 2017) (concluding that prayer before school board meetings was consistent with the broader tradition of "opening meetings of deliberative bodies with invocations"). With that standard in mind, we turn to the historical record.

1.

The historical evidence comprises four categories: *first*, the behavior of early federal judges and Justices in court-related proceedings; *second*, the in-court behavior of those judges and Justices; *third*, the in-court behavior of non-federal judges; and *fourth*, indirect evidence of the prevalence of court-room prayer.

That evidence is relevant, if at all, because widespread practice around the Founding helps reveal an amendment's original public meaning. *See McDonald v. City of Chicago*, 561 U.S. 742, 769–70 (2010). We address an incorporated amendment's application to a state, so we must also consider

practice around the time of incorporation. *See id.* at 770–78.[7]  Our analysis depends on "original meaning and history," with particular attention paid to "historical practices." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (quotation omitted).

Evidence in the first category is plentiful but similar.  While riding circuit, early Supreme Court Justices often presided over the opening of new court terms or new grand jury terms.[8]  In some circuits, though far from all, such proceedings opened with a chaplain-led prayer.[9]  At those ceremonies,

---

[7] Considering evidence around that time does not necessarily mean that we are primarily concerned with the original public meaning of the Establishment Clause in 1868 instead of 1791. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 (2022).  We express no opinion on which public meaning determines the Establishment Clause's scope because we see no evidence that the public meaning changed between 1791 and 1868.  *Id.*  We consider evidence from the period leading to incorporation because the Supreme Court has considered the understanding of the "ratifiers of the Fourteenth Amendment," *McDonald*, 561 U.S. at 778, relevant to understanding this country's "history and tradition," *id.* at 767 (quotation omitted).  And our inquiry today concerns history and tradition.

[8] 2 The Documentary History of the Supreme Court of the United States, 1789–1800 5 (Maeva Marcus et al. eds., 1941) ("The address, or charge, was an important part of the court opening ritual. . . .  Part sermon, part political disquisition, part jurisprudential essay, the charge served to inform jurors about current issues of law and politics.").

[9] Such ceremonies, over which a coalition of one or more Supreme Court Justices plus local circuit judges presided, took place in Massachusetts in May 1790 with Chief Justice Jay, 2 Documentary History, *supra* note 8, at 60; in Massachusetts in October 1790, May 1791, November 1791, and May 1792 with Chief Justice Jay and sometimes Justice Cushing, *id.* at 104–05, 164–65, 231–32, 276–77; in Massachusetts in October 1792 with Justice Iredell, *id.* at 317; in Rhode Island in November 1792 with Justices Wilson and Iredell, *id.* at 331; in Massachusetts in June 1793 with Justice Wilson, *id.* at 406; in Rhode Island in June 1793 with Justice Wilson, *id.* at 412; in Rhode Island in November 1793 with Justice Wilson, *id.* at 430; in Massachusetts in June 1794 with Justice Cushing, *id.* at 475; in Rhode Island in November 1794 with Justice Cushing, *id.* at 496; and in New Hampshire in May 1800 with Justice Paterson, 3 The Documentary History of the Supreme Court of the United States, 1789–1800 436 (Maeva Marcus et al. eds., 1941).  That tradition persisted in Massachusetts until at least 1845.  *U.S. Circuit Court—Boston, Oct.*, The New Era, Oct. 22, 1845 (a Virginia newspaper describing a

the Justices also charged the newly empaneled grand jurors.[10] Those charges often included religious supplications.[11]

Evidence in the second category constitutes the limit of what might be considered prayer. For instance, the most recognizable item in this category is the Supreme Court's—and our court's—ancient and ongoing tradition of opening court with some version of the cry, "God save this honorable court!"[12] Oaths administered to witnesses including phrases such as "So help you God" occupy similar space.[13] This category also includes one

---

ceremony over which Justice Woodbury presided).

[10] 2 DOCUMENTARY HISTORY, *supra* note 8, at 5.

[11] Justice Paterson in 1795: "May the God of Heaven be our protector and guide, and enable us all to discharge our official, relative, and social duties with diligence and fidelity." 3 DOCUMENTARY HISTORY, *supra* note 9, at 60. Justice Iredell in 1795 prayed, of the lessons taught by the Whiskey Rebellion: "God grant it may not be without its effect on other times and other Countries, nor ever be obliterated from the memory of our own." *Id.* at 78. He repeated the plea in a similar charge the following year. *Id.* at 109. Justice Iredell in 1797: "May God in his mercy preserve us from [the loss of order and justice], and on the contrary enable this country . . . to present the spectacle of a people, who knowing what freedom is . . . at all hazards will defend it against all attacks . . . ." *Id.* at 168. Justice Cushing in 1798: "God grant that all national differences may soon be accommodated; and the blessings of peace—substantial liberty, and stable government, be the portion of all nations!" *Id.* at 312 (emphasis deleted). Justice Iredell in 1799: "May that God whose peculiar providence seems often to have interposed to save these United States from destruction, preserve us from [anarchy,] this worst of all evils!" *Id.* at 350–51.

[12] That practice "was inherited from England." Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 COLUM. L. REV. 2083, 2110 & n.153 (1996).

[13] Such oaths were common and, in some places, required in the early United States. *See* 1 JOHN BOUVIER, A LAW DICTIONARY 447 (1st ed. 1839) (noting that grand jurors swore an oath including the phrase "so help you God."); 1 *id.* at 100 ("As atheists have not any religion that can bind their consciences to speak the truth, they are excluded from being witnesses."); 1 *id.* at 436 ("[W]hen the witness believes in a God who will reward or punish him even in this world, he is competent."); 2 *id.* at 199 ("A judicial oath is a solemn declaration . . . before a court of justice . . . by which the person who takes it promises to tell the truth . . . and appeals to God for his sincerity."); 2 *id.* at 454 (describing a process for selecting jurors); 2 *id.* at 499 (describing qualifications for witnesses). Even early federal judges'

instance of a Supreme Court opinion that purported to invoke a "prayer."[14]

Evidence in the third category spans the longest period. It begins with the English practice of accompanying death sentences with the declaration, "[M]ay the Almighty God have mercy on your souls."[15] Some early American state courts had similar practices.[16] There is also scattered evidence of

---

oaths of office contained a similar phrase. 2 Documentary History, *supra* note 8, at 515 (reprinting Section 8 of the Judiciary Act of 1789).

Religious language was often used in discussing a witness's obligation to tell the truth. Take, for example, Chief Justice Jay's charge, while riding circuit, to a grand jury: "Independent of the abominable Insult which Perjury offers to the divine Being, there is no Crime more extensively pernicious to society. . . . Testimony is . . . given under those solemn obligations which an appeal to the God of Truth impose; and if oaths should cease to be held sacred, our dearest and most valuable Rights would become insecure." 2 *id.* at 284. Of a witness's oath, a circuit judge once remarked, "It is nothing less than a prayer, in which all unite that you may be aided by God to keep the solemn promise you have made." *United States v. Martin*, 26 F. Cas. 1181, 1183 (C.C.D. Tenn. 1870) (No. 15,730) (jury charge).

[14] *M'Ilvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280, 312 (1805) ("But an event may happen (which every good man should join with my Lord Coke in his devout prayer, 'that God of his infinite goodness and mercy may prevent,')—time may come when this bond of union may be broken . . . ."); *see also Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 450 (1793) (Iredell, J., dissenting) ("I pray to God, that if [a rule allowing individuals to sue a state in federal court] be established by the judgment of this Court, all the good . . . may take place, and none of the evils with which, I have the concern to say, [the rule] appears to me to be pregnant."), *superseded by constitutional amendment*, U.S. Const. amend. XI; *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 93 (1823) ("[W]e hold ourselves answerable to God, our consciences, and our country, to decide this question according to the dictates of our best judgment, be the consequences of the decision what they may.").

[15] Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1182 (1991) (quotation omitted).

[16] *See, e.g.*, *State v. Washington*, 1 S.C.L. (1 Bay) 120, 156–57 (S.C. 1791) (explaining that the Chief Justice of South Carolina implored a condemned prisoner to "employ that little interval of life which remained[ ] in making his peace with that God whose law he had offended" and "prayed that the Lord might have mercy on his soul!").

Some federal courts did the same, adding to the second category of evidence. *See, e.g.*, *United States v. Gibert*, 25 F. Cas. 1287, 1317 (C.C.D. Mass. 1834) (No. 15,204) (Story, J.) ("I earnestly recommend to each of you . . . to seek the favor and forgiveness of

No. 21-20279

pre-court prayers of uncertain regularity throughout the nineteenth and twentieth centuries.[17]

The fourth category comprises miscellanea suggesting that prayer was no stranger to Founding- and incorporation-era courtrooms. For example, Chief Justice Jay acknowledged, without apparent surprise, that it was the "ancient us[e]" and "custom" of some New England states to open court terms with a prayer.[18] And Mack has located a prayer book from 1835 in which the clergyman-author included a model "Prayer for Courts of Justice" just before the model "Prayer for a Legislative Assembly."[19]

---

Almighty God . . . ; and for this purpose I earnestly recommend to you, and to each of you, to seek the aid and assistance of the ministers of our holy religion of the denomination of Christians to which you[ ] severally belong. And in bidding you . . . an eternal farewell, I offer up my earnest prayers that Almighty God may in his infinite goodness have mercy on your souls."); *United States v. Gleason*, 25 F. Cas. 1335, 1339 (C.C.D. Iowa 1867) (No. 15,216) ("[M]ay God, the wise Governor of the universe, who is equally the Father of the judge . . . and the criminal . . . , have mercy on you.").

[17] Mack provides accounts ranging from the Massachusetts Supreme Court in 1823 to a Florida county justice court in 1996. An account of the latter proceeding is available at *Court Holds First Session*, St. Petersburg Times, July 30, 1996, 1996 WLNR 2378937. At least one author thought such ceremonies common: "Many courts hold a certain number of stated 'terms' annually . . . lasting sometimes but a few days and sometimes months. In a number of States such terms are opened by prayer offered by a minister of religion, invited in for the purpose by the sheriff or court attendant." Simeon E. Baldwin, The American Judiciary 197 (1905).

[18] A newly-appointed Massachusetts circuit judge wrote to Chief Justice Jay to discuss plans for the ceremonial opening of the court term. He asked whether the coming circuit justices "would wish to have a Clergiman attend as Chaplin, as has been generally the Custom in the New England States, upon such Occasions." Letter from Richard Law to Chief Justice Jay (Feb. 24, 1790), *in* 2 Documentary History, *supra* note 8, at 11, 11. Chief Justice Jay replied, "It appears to me adviseable to respect ancient usages in all Cases where Deviations from them are not of essential Importance. . . . The custom in New England of a clergyman's attending, should in my opinion be observed and continued." Letter from Chief Justice Jay to Richard Law (Mar. 10, 1790), *in* 2 Documentary History, *supra* note 8, at 13.

[19] Alexander V. Griswold, Prayers Adapted to Various Occa-

2.

The plaintiffs and their *amici* advance several reasons to disregard that evidence.  Generally, they say Mack has provided selective, acontextual "law-office history."  Some of their criticisms have merit.  But on the whole, Mack has identified enough evidence to satisfy the legal standard.

Start with the first category.  The plaintiffs and their *amici* call those instances irrelevant because they occurred, not before ordinary court sessions, but during the ceremonial openings of court *terms*.  *Amici* explain, "[T]hese opening court days had special ceremonial importance."  What the early Supreme Court Justices did during such ceremonies, the argument goes, can tell us nothing about the original understanding of the Establishment Clause's effect on *daily* courtroom prayer.

That objection merits serious consideration.  Prayers in the first category are less probative than they would be if they had occurred before daily court sessions.  But neither should we too readily ignore the fact that it was common for early Supreme Court Justices and federal judges to preside over official court proceedings at which chaplains delivered opening prayers.  If we are to have a law of rules, we must not reflexively allow any factual difference to dissuade us from treating two situations alike.  Instead, we look to legal doctrine to decide whether a distinction makes a difference.

So consider the two most prominent Establishment Clause tests previously used by the Supreme Court: "the endorsement test[ ] and the coercion test."  *McCarty*, 851 F.3d at 525 (footnotes omitted).[20]  The endorse-

---

sions of Social Worship 149–51 (1835); Griswold later wrote of the book, "How extensively the prayers which I have published are used in my Diocese I do not exactly know."  Julia C. Emery, Alexander Viets Griswold and the Eastern Diocese 52 (1921).

[20] We do not suggest that those tests govern our overall analysis.  History—not

ment test asks whether the government sent "a message that religion is favored, preferred, or promoted over other beliefs." *Id.* at 525 n.11 (quoting *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996)). The coercion test asks whether the government obliged objectors to participate in "a formal religious exercise." *Id.* at 525 n.12 (quoting *Doe ex rel. Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 285 (5th Cir. 1999)).

Is it any less an endorsement of religion to permit chaplains to pray before ceremonial court-term openings than to permit them to pray before ordinary court days? No. We have explained that endorsement occurs where "officials in their capacity as representatives of the state . . . set[ ] aside special time for prayer that [is] not set aside for anything else." *Ingebretsen*, 88 F.3d at 280. Early Supreme Court Justices appeared at court-opening ceremonies as representatives of the fledgling federal judiciary. Their official participation was an "important part of the court opening ritual," as *amici* explain. Unquestionably, ceremonies that included chaplain-led prayer gave that prayer "special time" not afforded to other conceivable messages. *Id.*

If that treatment before daily court proceedings sends a message that "religion is favored," *McCarty*, 851 F.3d at 525 n.11 (quotation omitted), it does the same before court-opening ceremonies. In fact, that message may be stronger at irregular ceremonies. Without the opportunities for denominational pluralism that daily ceremonies afford, there is a greater risk that attendees will perceive a chaplain's selection as an endorsement of the tenets of

---

endorsement—matters. *Kennedy*, 142 S. Ct. at 2427–28. Here, we look to those tests for the limited purpose of deciding whether historical evidence is similar enough to the challenged practice to establish consistency.

We do not, however, consider the *Lemon* test. Its long Night of the Living Dead, *Lamb's Chapel v. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment), is now over, *Kennedy*, 142 S. Ct. at 2427. And it is too easily manipulated to shed light on history's relevance.

his particular faith.  So the endorsement test provides no reason to disregard Justices' behavior at court-opening ceremonies.

Is it any less coercive to permit chaplains to pray before ceremonial court-term openings than to permit them to pray before ordinary court days? Maybe.  Citizens could ignore the former if they wished.  So the answer depends on whether court attendees are "oblige[d]," *id.* at 525 n.12 (quotation omitted), to participate in the pre-court prayers.  That is conceivably true; some court attendees, such as defendants and subpoenaed witnesses, do not attend court by choice.

But it is also possible for daily courtroom prayer to be entirely voluntary if the prayer occurs before the court's business begins.[21]  In other words, one can imagine forms of daily courtroom prayer that are precisely as coercive as prayer before court-term openings:  They oblige nothing but prevent people from witnessing official ceremonies unless they are willing to be present during prayer.

So we have no reason to disregard the evidence of chaplain-led prayer before court-term openings.  That evidence is similar enough to some versions of daily courtroom prayer that it can help establish that such prayer is consistent with the tradition of public, government-sponsored prayer.

On the Justices' religious charges to grand jurors, and on the evidence in the second category, the plaintiffs' response is the same:  That evidence is irrelevant because, although the speaker invokes God, those exclamations are not prayers.  They call those expressions mere "ceremonial deism," a term which they define as "a short phrase, ubiquitously utilized, that has minimal religious content, does not amount to worship or prayer, and does not reflect

---

[21] We do not here decide whether Mack's practice is noncoercive.  We address that issue *infra* Section III.D.

or refer to any particular religion." That definition, partly conclusional though it is, has previously been offered by individual Justices and scholars to explain the outcomes of the Supreme Court's Establishment Clause cases.[22] But the Court has never incorporated that explanation into its doctrine.

Even if the concept of "ceremonial deism" can sometimes help classify religious expressions as anodyne,[23] it cannot help distinguish prayer and nonprayer. Justice O'Connor provided three prototypical examples of what she considered "ceremonial deism": "the national motto ('In God We Trust'), religious references in traditional patriotic songs such as The Star–Spangled Banner, and the words with which the Marshal of [the Supreme] Court opens each of its sessions ('God save the United States and this honorable Court')."[24] But the last of those items is different from the rest: It not only refers to God but also speaks *to* Him and *asks* Him to do something—to save the country and the Court.

It is those (nonexclusive) elements—(1) supplication (2) to a divine being—that many religious traditions regard as prayer.[25] And the remaining

---

[22] *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 37–43 (2004) (O'Connor, J., concurring in the judgment); *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 602–03 (1989) (declining to comment on "the subject of ceremonial deism") (quotation omitted); *Lynch v. Donnelly*, 465 U.S. 668, 716–18 (1984) (Brennan, J., dissenting); Epstein, *supra* note 12, at 2091–96.

[23] *See, e.g.*, *Croft v. Perry*, 624 F.3d 157, 164–65 (5th Cir. 2010).

[24] *Newdow*, 542 U.S. at 37 (O'Connor, J., concurring in the judgment).

[25] *See, e.g.*, Quran 2:250 ("Our Lord, pour upon us patience and plant firmly our feet and give us victory over the disbelieving people."); Bhagavad Gita 11:44 ("Therefore, O adorable Lord, bowing deeply and prostrating before You, I implore You for Your grace. As a father tolerates his son, a friend forgives his friend, and a lover pardons the beloved, please forgive me for my offences."); Dr. A. Th. Philips, Daily Prayers 251 (rev. ed. 1900) ("Bless this year unto us, O Lord our God, together with every kind of the produce thereof, for our welfare; give a blessing upon the face of the earth."); *Psalm* 3:7 ("Rise up, O Lord! Deliver me, O my God! For you strike all my enemies on the cheek;

evidence in the first and second categories shares those elements.[26]  Exclamations in those categories were uttered or written in the judges' official capacities while they performed their core duties.  And one of those judges once explained of the oath "so help me God" that "[i]t is nothing less than a prayer, in which all unite that you may be aided by God."  *Martin*, 26 F. Cas. at 1183.  We have no principled basis for disagreement.

Yet the plaintiffs and their *amici* would still write it off as a "far cry from a full-fledged prayer."  We cannot say what makes a prayer "full-fledged."  *Amici* posit that these utterances contain "no content particular to any religion."  To the contrary:  Public supplications to one God are particular to monotheistic faiths in which such expressions are appropriate.  Such religions are distinct from other faiths and from nonfaith.[27]  And expressions sharing the principal characteristics of what those faiths consider prayers are far easier to distinguish from nonprayers than they are from whatever constitutes a "full-fledged prayer."

Whatever the differences among prayers, they are differences of degree, not of kind.  Those differences are still meaningful.  We acknowledge that an average person likely would perceive a chaplain-led prayer as more religious than the numerous examples of short, ecumenical, in-court prayers throughout our history.

But those differences do not render that evidence irrelevant.  So we include the first and second categories of historical evidence in deciding

---

you break the teeth of the wicked.") (New Revised Standard Version).

[26] *See supra* notes 8–14 and accompanying text.

[27] *See, e.g.*, *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1209–10 (5th Cir. 1991) (describing an atheist's refusing to swear an affirmation that "included a reference to God"); *cf. also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 626–30 (1943) (explaining that Jehovah's Witnesses refused to say the Pledge of Allegiance).

whether courtroom prayer is consistent with the relevant tradition.

On the third category, the plaintiffs and their *amici* say it is inappropriate to rely on scattered instances of state-court prayer, some of which occurred before the Establishment Clause was incorporated against the states.[28] We agree. The history cannot tell us about what "coexisted with the principles of disestablishment," *Chambers*, 463 U.S. at 786, if the actors did not consider themselves bound by the principles of disestablishment. And, although it is clear that prayer happened in state courts, there is too little evidence too thinly spread to conclude that those prayers occurred regularly.

The same is true of the fourth category of evidence. It reflects the reality that courtroom prayer was at least conceivable to some Americans. But it cannot independently establish anything with enough certainty.

So, on the whole, we have convincing evidence that it was common for Founding-era Justices to preside over court-term-opening ceremonies at which chaplains delivered prayers. We have comparable evidence that those Justices also personally delivered short, ecumenical supplications in charges to grand jurors and, sometimes, in their judicial opinions. And we have a litany of short, ecumenical supplications that federal courts have recited from the Founding to the present.

We conclude that, under the methodology of *Galloway*, the evidence establishes that courtroom prayer "fits within," 527 U.S. at 577, and is "consistent with the tradition," *id.* at 578, of prayer before "deliberative bodies," *McCarty*, 851 F.3d at 527. Although, as the plaintiffs and their *amici* have pointed out, the probative value of each item is less, there are still far more instances than the Supreme Court considered sufficient to establish consis-

---

[28] *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947).

tency.  *Galloway*, 572 U.S. at 578–79.

\*        \*        \*

Accordingly, we ask whether Mack's particular practice is consistent with that tradition.  *Id.* at 584–86; *McCarty*, 851 F.3d at 529–30.  The plaintiffs' remaining three contentions present reasons why that might not be so.  They say Mack's practice (1) includes prayers that are "often decidedly sectarian," (2) fails to maintain a policy of nondiscrimination, and (3) coerces attendees' participation.  We proceed in that order.

## B.

There likely is a genuine factual dispute about whether Mack's prayer ceremony has ever included sectarian prayers.  The plaintiffs say yes; Mack says no.  The plaintiffs provide an eyewitness account describing an opening prayer as a "five- to eight-minute [Christian] sermon."  And they complain that some prayers are "addressed to the Christian God," made in Jesus' name, and styled as the supplication of the whole audience.  Mack says no chaplain has ever proselyted or denigrated another faith or nonfaith.  He claims proselyting is "considered very inappropriate."  And he tells the chaplains that their remarks must be "brief" but otherwise gives no instructions.

But any such dispute is immaterial.  The Supreme Court has instructed that the "content of the prayer is not of concern to judges."  *Galloway*, 572 U.S. at 581 (quotation omitted).  "Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian."  *Id.* at 582.  Undisputed evidence shows that Mack follows that command.

There is, however, a limiting principle: "If the course and practice over time shows that the invocations denigrate nonbelievers or religious

minorities, threaten damnation, or preach conversion," the invocations are inconsistent with the public-prayer tradition. *Id.* at 583. Prayer must be "solemn and respectful in tone" and invite officials to "reflect upon shared ideals and common ends." *Id.*

None of the plaintiffs' evidence comes close to showing that Mack's practice fails to live up to that standard. At most, the plaintiffs' accounts can show that the contents of the prayers delivered in Mack's courtroom are quite like the contents of the prayers in the historical record. There is no suggestion that Mack's chaplains have preached damnation, denigration, or conversion. So we may not concern ourselves with the prayers' contents.

## C.

Similarly, there is no material dispute about the identity of Mack's chaplains. The plaintiffs have evidence that the list of prayer-eligible chaplains includes only Christian and Islamic clergy.[29] Mack says anyone in the JCC Program can give prayers, and he claims that the program has representatives identifying as Protestant, Catholic, Islamic, Buddhist, Hindu, Jewish, and Latter-day Saints. Mack denies that the plaintiffs' list accurately describes his procedures for selecting chaplains to pray, and he says his opening ceremonies have included "Hindu and Muslim speakers."

Even if the plaintiffs' evidence accurately describes the eligible volunteer chaplains, it doesn't matter. Mack must "maintain[ ] a policy of nondiscrimination," *Galloway*, 572 U.S. at 585, and the plaintiffs' evidence does not hint that Mack discriminates based on belief. Mack need not "search" or try "to achieve religious balancing." *Id.* at 586. Yet uncontradicted evidence

---

[29] The plaintiffs' list appears to include only the JCC Program members who have agreed to be on call generally—not those who are willing to serve as volunteer chaplains only for members of their respective faiths.

shows that he does just that.

Mack maintains a policy of nondiscrimination so long as (1) members of any faith are free to participate in the JCC Program and (2) he selects prayer-givers from among those members without regard for belief. The plaintiffs have identified no evidence that suggests those elements are unsatisfied. So there is no material factual dispute on nondiscrimination.

### D.

That leaves coercion. The plaintiffs say courtroom prayer inherently coerces attendees and that even if not, the specific attributes of Mack's prayer practice evince coercion. To decide whether their evidence could establish material factual disputes, we turn once again to *Galloway*.

### 1.

The *Galloway* Court could not agree on the standard for showing that the government has coerced religious exercise.[30] So there are four opinions relevant to the question whether Mack's practice is coercive.[31]

A three-Justice plurality, led by Justice Kennedy, recognized that objective evidence that a person has been treated differently from others, even if that difference is abstract, can show coercion. The plurality's approach is "fact-sensitive" and holistic. *Galloway*, 572 U.S. at 587. But it emphasizes that subjective offense "does not equate to coercion." *Id.* at 589. Reports of subjective pressure to participate require "evidentiary support," such as indications that "leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depend-

---

[30] *See also Kennedy*, 142 S. Ct. at 2429.

[31] We consider ourselves lucky that there are only four. *See generally Am. Legion*, 139 S. Ct. at 2073–2116.

ing on whether they joined the invitation or quietly declined." *Id.* Courts must assess "whether coercion is a real and substantial likelihood." *Id.* at 590.

Two Justices, led by Justice Thomas, advanced a stricter coercion test. Their approach would recognize coercion only as compulsion "of religious orthodoxy and of financial support by force of law and threat of penalty." *Id.* at 608 (quotation omitted and emphasis deleted). In other words, the perception of "subtle pressure" or "government endorsement" doesn't count. *Id.* at 609 (quotations omitted and alteration adopted).

Four Justices, led by Justice Kagan, dissented. They posited the following hypothetical:

> You are a party in a case going to trial . . . . The judge bangs his gavel to call the court to order, asks a minister to come to the front of the room, and instructs the . . . individuals present to rise for an opening prayer. The clergyman faces those in attendance and [delivers a sectarian, Christian prayer]. The judge then asks your lawyer to begin the trial.

*Id.* at 617. Those Justices expressed "every confidence" that the Court would hold that practice unconstitutional. *Id.* at 618.

Two Justices, led by Justice Alito, responded to the dissent's hypothetical. They appeared to agree that the hypothetical portrays an Establishment-Clause violation. *Id.* at 603. Accordingly, they reported "concern[ ] that at least some readers will take [that hypothetical] as a warning that [*Galloway* would lead] to a country in which religious minorities are denied the equal benefits of citizenship." *Id.* "Nothing," they wrote, "could be further from the truth." *Id.*

We assume, without deciding, that Justice Kennedy's approach controls the coercion standard. Where no majority opinion governs an issue, ordinarily we ask which position could sustain the Supreme Court's judg-

ment "on the narrowest grounds,"[32] provided that "there is some common denominator upon which all of the Justices of the majority can agree."[33] But there is no reason to decide whether Justice Kennedy's or Justice Thomas's approach is the narrower ground for decision because any practice deemed coercive under the latter approach will also be coercive under the former. So if a plaintiff's challenge fails under Justice Kennedy's approach, it "fails under either standard." *Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 516 (6th Cir. 2017) (en banc). As we will explain, that is so here.

We also reject the plaintiffs' suggestion that the Supreme Court identified a courtroom-prayer practice as "the paradigmatic circumstance in which coercion is present." Set aside the fact that the combination of a concurring and a dissenting opinion makes no law. Even if it were binding that six Justices agree that the *Galloway* dissent's courtroom-prayer hypothetical presents an Establishment Clause violation, it would make no difference. In that hypothetical, the prayer happens after the court is called "to order," and the judge "instructs" the litigant to rise. *Galloway*, 572 U.S. at 617. Those facts explain why Justice Scalia, who separately joined an opinion explaining that coercion requires direction by force or threat, *id.* at 608, apparently thought the hypothetical illustrates coercion, *id.* at 592, 603. And those facts distinguish the hypothetical from Mack's practice.

Accordingly, we ask whether the plaintiffs' evidence creates a material factual issue under Justice Kennedy's approach.

## 2.

The plaintiffs' theory that courtrooms are inherently coercive con-

---

[32] *Marks v. United States*, 430 U.S. 188, 193 (1977) (quotation omitted).

[33] *Whole Woman's Health v. Paxton*, 10 F.4th 430, 440 (5th Cir. 2021) (en banc) (quoting *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013)).

flicts with that test.  True, courtrooms present a heightened risk for coercion because the adjudicative process creates opportunities to treat litigants differently.  But that fact does not mean we may disregard the requirement that a plaintiff's subjective perception of disfavor has "evidentiary support."  *Id.* at 589.  Remember:  The town-board meetings in *Galloway* had adjudicative elements too, *id.* at 624, and as in Mack's case, the prayers occurred in the "ceremonial portion of the town's meeting," *id.* at 591, while attendees were free to leave, *id.* at 590.  With so many factual similarities to *Galloway*, we are not free to invent our own legal standard.

Likewise, we cannot credit the plaintiffs' assertion that "coercion in a courtroom doesn't come from the imposition of actual prejudice; it comes from a perceived *risk* of prejudice."  The plaintiffs must present evidence that any such perception is objectively reasonable—evidence from which we can conclude that "coercion is a real and substantial likelihood."  *Id.*  Accordingly, we disregard Roe's assessment that a lawyer would be "crazy to leave" during the ceremony for fear of rankling Mack.

That leaves us with two categories of evidence: *first*, evidence regarding entry and exit from Mack's courtroom; and *second*, evidence concerning Mack's decisions in cases involving nonpraying litigants.

Evidence in the first category is sparse.  The plaintiffs intimate Mack's practice is designed to identify the unrighteous by making it "impossible to inconspicuously remove oneself to avoid the prayer."  But the evidence shows only that litigants must check in with the clerk to have their cases called and that the door is locked when there is no one to guard it.  There is nothing untoward about those practices.  And none of the complainants in the record has even *tried* to leave the room for the prayer.  So our only evidence of what happens to those who leave comes from Mack's side of the dispute.

A court staffer testified that attendees regularly leave during the open-

ing ceremony and that staff do not know the reason for their departures. In other words, as in *Galloway*, choosing not to participate does not "stand out as disrespectful or even noteworthy." *Id.* at 590. Far from being "dissuaded from leaving the [court]room during the prayer [or] arriving late," *id.*, attendees are expressly, repeatedly invited to do either of those things. The first category of evidence does not support the plaintiffs' theory.

Evidence in the second category is speculative. Recall that two complainants say their nonparticipation affected their cases. But neither of those affiants can show that. One got the precise penalty for which she plea-bargained, and the other won the eviction he sought. They offer nothing more than the subjective perception that Mack disliked them.

That evidence cannot defeat a motion for summary judgment because it states a "speculative theory, neither more nor less supportable in th[e] record than any . . . other speculative theor[y]." *Little v. Liquid Air Co.*, 37 F.3d 1069, 1077 (5th Cir. 1994) (en banc) (per curiam). Stripped to their facts, the anecdotes in the second category can be explained equally by the theory that Mack had no idea whether those litigants participated in the prayer—as he claims—and that Mack and the litigants merely shared small disagreements about the law.

So we conclude that Mack's practice is noncoercive. That conclusion means that Mack has shown there is no "genuine dispute as to any material fact" concerning whether his prayer practice is consistent with the tradition of public, government-sponsored prayer. FED. R. CIV. P. 56(a).

\*     \*     \*

Justice O'Connor once observed that "[t]here are no *de minimis* violations of the Constitution." *Newdow*, 542 U.S. at 36 (concurring in the judgment). Just so. We do not overlook a religious establishment because it is a short prayer before a county justice court where all judgments will be

No. 21-20279

reviewed *de novo*.  Instead, the "history, character, and context" of Mack's ceremony show that it is no establishment at all.  *Id.* at 37.

To maintain a lawful prayer ceremony, Mack must ensure that (1) he has a policy of denominational nondiscrimination and that (2) anyone may choose not to participate and suffer no consequences.  Mack has shown that the plaintiffs fail materially to dispute those elements.

The judgment is REVERSED, and a judgment of dismissal of the individual-capacity claims is RENDERED.

21-20279

E. GRADY JOLLY, *Circuit Judge*, concurring in part and dissenting in part:

I agree that the grant of summary judgment for Plaintiffs should be reversed: there are factual disputes that could be material in evaluating the religious practices of Judge Mack in his courtroom. I disagree, though, that this panel should enter summary judgment for Judge Mack. Respectfully, I consider the panel majority to have erred in the following ways.

*First*, although the majority's opinion states that the "[w]ant of evidence showing coercion dooms [this] case," Maj. Op. 2, it is actually the want of *acknowledging* evidence of coercion that dooms the majority opinion. I invite the majority to step back and absorb the following picture painted by Plaintiffs' evidence. When litigants enter Judge Mack's courtroom, they must decide whether they will stay for the prayer ceremony or exit the courtroom for its duration. If they stay, thus aligning with Judge Mack, the courtroom is closed and the door is locked, leaving only the righteous with the judge. The litigants cannot sit back and observe: they are required to stand for the prayer ceremony. And when the actual prayer begins, the testimony indicates that Judge Mack scans the courtroom, leaving the impression upon litigants that he is indeed judging audience participation despite their supposed ability to abstain without consequence.

If a litigant who has chosen to stay in the courtroom does not participate, they risk upsetting Judge Mack, the decider of their cases, *immediately before* he hears their cases. It is reasonable to believe that nonparticipation will draw his ire: Judge Mack, a Pentecostal minister who has affirmatively stated that he seeks to spread the gospel of Jesus Christ, made a campaign promise to establish prayer in his courtroom. He has previously criticized opponents of his prayer ceremony[1] and has acted hostile

---

[1] Judge Mack's courtroom prayer ceremony once led to an investigation by the State

21-20279

following a litigant's noncooperation in the prayer.[2] *See Town of Greece v. Galloway*, 572 U.S. 565, 589 (2014) (plurality opinion) (considering, in the coercion analysis, if citizens "were received differently depending on whether they joined the invocation or quietly declined"). The testimony demonstrates that litigants recognize this risk and choose not to protest because of it.

If, alternatively, the litigant leaves before the prayer starts, thus segregating themselves from Judge Mack's prayer ceremony, they are locked out of the room, and can only re-enter after Judge Mack has taken the bench. The testimony indicates that in this circumstance, the judge will particularly notice their absence. Thus, although a litigant can avoid the actual prayer, none can avoid signaling their absence to the judge.

Judicial religious ceremonies like Judge Mack's present an even greater risk of coercion than legislative prayers. Unlike a legislative setting,

---

Commission on Judicial Conduct. Following that investigation, Judge Mack emailed his supporters stating: "There are those local haters among us, backed by bureaucrats in Austin and reinforced by well funded national organizations who exist for the purpose of removing our basic religious freedoms . . . . The first rounds of the fight were won handily. Atheists brought a complaint to the Judicial Conduct Commission, while it proved to be without merit, sympathetic bureaucrats without authority directed that the programs be ended. [We were able to prevail with the Commission], but the liberal bias of a few has made it necessary to press on."

[2] Scott Smith, an attorney, once appeared in Judge Mack's courtroom for an eviction hearing regarding his own property. When the prayer ceremony started, Smith chose not to bow his head for the prayer, and he claims that Judge Mack saw him. When it was time for Smith's case, Smith claims that Judge Mack "acted unprofessional and hostile toward [him]." Smith states that Judge Mack twice left the courtroom during his case without explanation, and that when Smith commented on this, the Judge told Smith that he (the judge) "could do whatever he wants." Smith further alleges that although he was entitled to damages by law, and that although state law provides for other remedies, Judge Mack denied his request for damages, did not give him the additional remedy, and tersely told Smith that he (again, the Judge) "didn't have to do that" and that he "can do what he wants."

which has multiple decisionmakers and a deliberative decision-making process (thus reducing the fear that upsetting one or two decisionmakers will result in adverse effects), Judge Mack makes his decisions alone. His litigants understand this dynamic, thus increasing the chances that litigants will feel obliged to participate in Judge Mack's ceremony to avoid losing their cases. Furthermore, in evaluating legislative prayers, the Supreme Court has found such prayers to be non-coercive when the "[t]he principal audience for these invocations [was] not, indeed, the public but lawmakers themselves." *Id.* at 587. After all, the risk that the public will feel obliged to participate in prayer is reduced when the prayer ceremony is not directed at them. But here, the prayer ceremony is not designed for Judge Mack. In his own words, the prayer ceremony is designed to set a tone for "*everybody* that's in the courtroom." That the prayer ceremony is directed at the audience Judge Mack holds power over further demonstrates the likelihood of coercion.

Taking this evidence in the light most favorable to Plaintiffs, as we must when reviewing a defendant's motion for summary judgment, *see Valderas v. City of Lubbock*, 937 F.3d 384, 388 (5th Cir. 2019) (per curiam) (quoting *Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005)), Plaintiffs have produced considerable evidence showing that Judge Mack conducts his opening prayer and other religious ceremonies[3] "in such a way as to oblige the participation of objectors." *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 526 n.12 (5th Cir. 2017) (quoting *Doe ex rel. Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 285 (5th Cir. 1999), *aff'd on reh'g en banc sub nom. Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462 (5th Cir. 2001)). For the majority to find that there is *no evidence* of coercion, suggests, in my opinion, willful blindness and indisputable error.

---

[3] I say "ceremonies" because some evidence indicates that some ministers use their allotted time to give a mini-sermon.

35

*Second*, and related to the first point above, the majority impermissibly engages in factfinding, resolving numerous material factual disputes. *See Maine v. Taylor*, 477 U.S. 131, 144–45 (1986) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982)) (noting that factfinding "is the basic responsibility of district courts, rather than appellate courts"); *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (citing *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)). For example, although the majority candidly notes Plaintiffs' evidence that the courtroom door is locked before and during the prayer ceremony, Maj. Op. 30, it then acts as a factfinder and discards that evidence as unpersuasive. The majority further concludes that this evidence is unconvincing because, to them, locking the door to a courtroom to keep litigants either in or out is "not untoward." Maj. Op. 30. Similarly, the majority concludes on its own that choosing not to participate in the prayer ceremony "does not 'stand out as disrespectful or even noteworthy,'" and that litigants are "far from being 'dissuaded from leaving the [court]room.'" Maj. Op. 31 (citing *Galloway*, 572 U.S. at 590). However the facts may be resolved, we do know this: an appellate panel is not where it occurs.

*Third*, despite digging into the history books, the majority's opinion comes up dry on historical precedent. The limited historical evidence that it cites illustrates practices that are (A) too dissimilar to establish a tradition of daily judicial prayer by a minister and (B) much too infrequently having occurred to establish a *long-standing tradition* of judicial religious ceremonies. *See Galloway*, 572 U.S. at 577 (citing *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989) (Kennedy, J., concurring in part and dissenting in part), *abrogated on other grounds by Galloway*, 572 U.S. at 579–80) ("[I]t is not necessary to define the precise boundary of the Establishment Clause where history shows that the *specific practice is permitted*. Any test the Court adopts must acknowledge a practice that was

accepted by the Framers and *has withstood the critical scrutiny of time and political change*." (emphasis added)).  The majority opinion, in its sparse references, remote in time, hardly supports its overreaching opinion.[4]

*Fourth* and finally, the majority inaccurately presents recent Supreme Court precedent.  The majority represents *Galloway* to stand for a broad and general tradition of "government-sponsored prayer," (including courtroom prayer), Maj. Op. 13, although nothing in that opinion suggests such a broad holding.  *Galloway*, 572 U.S. at 577 (assessing whether the prayer practice in question "fits within the tradition long followed *in Congress and the state legislatures*" (emphasis added)).  Instead, the majority attempts to distinguish the most specific and timely Supreme Court commentary we have on this issue.  Justice Kagan specifically asserted in her *Galloway* dissent, with apparent support from five other Justices, that a judicial prayer remarkably similar to Judge Mack's practices would be unconstitutional.  *Id*. at 617 (Kagan, J., dissenting).  We repeat: five other Justices apparently agreed. *Compare id*. (joined by Justices Ginsburg, Breyer, and Sotomayor), *with id*. at 603 (Alito, J., concurring) (seemingly agreeing in a concurrence joined by Justice Scalia).  The majority only notes two paper-thin distinctions between Judge Mack's ceremony and Justice Kagan's hypothetical.  In short, the majority's determination to reach its outcome brushes past the views of six Supreme Court Justices.

I conclude by respectfully suggesting that this Court affirm the district court's denial of Judge Mack's motion for summary judgment and remand for an adversary hearing allowing for the development of a full record and an appropriate resolution by a factfinder.  Only at that point can we fairly judge

---

[4] As Plaintiffs point out, tens of thousands of judges have taken the bench in America over the course of our history.  The fact the majority can find, among thousands, a few infinitesimal outliers who have engaged similar judicial prayers is unsurprising.

21-20279

this First Amendment case involving daily courtroom prayer (and sometimes sermons) for which there is no precedent.

I respectfully concur in part and dissent in part.